OPINION OF THE COURT
David B. Saxe, J.
Recently, sponsor defaults in converted cooperative housing have become overwhelming (see, eg., NY Times, June 16, 1991, section 10, at 1). For the most part, however, due in part to pressure by public officials and to a desire of all sides to "work out” a satisfactory accommodation, these defaults have not led to bank foreclosures. In this unique mortgage foreclosure action, involving an individual lender rather than an institution, a "work-out” could not be reached. Accordingly, I am asked to resolve the following principal issue: Upon a foreclosure and sale of premises previously converted to cooperative ownership, what are the rights, if any, of the proprietary lessees?
The complex of three four-story brownstones, located at 145-147-149 East 61st Street in Manhattan, was owned by Angela De Santis until 1988, when they were purchased by White Rose Associates, a partnership led by Robert Ettinger, to be converted to cooperative ownership. Instead of paying Mrs. De Santis the full purchase price outright and financing the purchase price with a bank loan and mortgage on the premises, White Rose Associates financed part of the purchase price by giving Mrs. De Santis a $2.5 million purchase-money mortgage, in effect a loan by the seller to the buyer.
*569 Upon conversion only 7 of the complex’s 24 units were sold, while the 17 remaining apartments continued to be occupied by tenants whose rent-stabilized monthly rent was substantially lower than the monthly maintenance charge on those apartments. Since the amount of monthly maintenance the sponsor was required to pay was substantially greater than the amount the sponsor received in rent payments from its tenants, White Rose was ultimately unable to cover the mortgage payments it owed to Mrs. De Santis, and consequently defaulted on her purchase-money mortgage. This foreclosure proceeding ensued, in which Mrs. De Santis sought a judgment directing that the buildings be sold and the proceeds used to pay the debt owed to her.
Pursuant to a judgment of foreclosure dated February 6, 1991, a judicial sale of the buildings was ultimately held, and for the price of $450,000, Mrs. De Santis reacquired title by way of a Referee’s deed dated May 29, 1991.
Mrs. De Santis now requests an order pursuant to RPAPL 221, putting her in possession of the premises and directing the Sheriff of New York County to remove certain occupants, both former co-op owners and rental tenants of the buildings’ apartments, who she claims are not current in their payment of use and occupancy.
The order sought by Mrs. De Santis is the descendent of the common-law writ of assistance, an old chancery writ, which was available to enforce any judgment or order awarding possession of real property in a direct action for land (see, O’Connor v Schaeffel, 111 NYS 737 [City Ct 1890]). Issuance of the writ was discretionary, and required a showing that the Referee’s sale was confirmed, that the purchaser received a deed from the Referee, and that the deed was shown to the party in possession accompanied by a demand for possession which was refused (supra; Wilbor v Danolds, 59 NY 657 [1875]).
The need for the common-law writ of assistance was abolished and supplanted by a statute providing for such an order of possession (see, Stahl v Norwich, 204 App Div 552 [4th Dept 1923]). The present statute, RPAPL 221, and its predecessors, also permits the court in its discretion, upon a similar showing, to issue an order in the nature of a writ of assistance, requiring the Sheriff to put the purchaser into possession of the property (see, Eggers v Capo, NYLJ, Aug. 22, 1969, at 11, col 5 [Sup Ct, Westchester County]).
*570 The case law and rent laws and regulations establish that those occupants who choose to remain as renters cannot be ousted pursuant to a writ of assistance as long as they continue to pay rent (see, 9 NYCRR 2504.1; Da Costa v Hamilton Republican Club, 185 Misc 865 [Sup Ct, NY County 1946, Shientag, J.]; Pisani v Cominger, 36 AD2d 593 [1st Dept 1971]). However, the law regarding whether similar protections are available to proprietary lessees is less well established. Unlike renters who decline to purchase under a non-eviction conversion plan and thus, retain their status as protected by the Rent Stabilization Law (see, General Business Law § 352-eeee [2] [c] [ii]), renters who elect to purchase their apartments may be viewed as having voluntarily relinquished their rights and protections under the Rent Stabilization Law in order to obtain the benefits and advantages of being a cooperative shareholder. Additionally, people who first moved into the building as purchasers never had rent-stabilized tenant status in the first instance. Indeed, these cooperators may be viewed as owners and investors more accurately than as tenants. Yet, the cooperators here claim that upon the foreclosure sale they "resumed” or "reverted back to” rent-stabilized tenant status. Can they revert back to a status that they waived, or indeed, that they never had?
The case of Greenberg v Colonial Studios (105 NYS2d 494 [Sup Ct, NY County 1951, Steuer, J.], revd 279 App Div 555 [1st Dept 1951]) presented a similar set of facts. The premises in question was a 15-story apartment house at 39-41 West 67th Street, containing 37 apartments. It was owned by Colonial Studios, a New York corporation, and was originally intended to be owned and operated as a cooperative apartment house. At the time of the action, only 9 of the 37 apartments were allocated to shareholders, the other units being occupied by renters. Some of the nine shareholders occupied their apartments, while others rented all or portions of their apartments. The first mortgagee commenced a foreclosure action and ultimately its assignee took title to the premises under a Referee’s deed; he then sought a writ of assistance to remove the former proprietary lessees. The landlord argued that these nine shareholders stood in the position of former mortgagor-owners, outside the protection of the emergency rent laws. The shareholders contended that they were tenants of the prior owner, and as such could not be removed absent compliance with the emergency rent laws. The trial court granted the application for a writ of assistance, holding *571 that cooperative ventures were not included under the protection of the emergency rent laws in that "the proprietary lessee is the owner of his space” (see, Greenberg v Colonial Studios, 105 NYS2d, supra at 496, citing Smith v Feigin, 273 App Div 277, affd 298 NY 534). However, that holding was reversed by the Appellate Division, with the oblique explanation that the "appellants should be treated as tenants in the circumstances presented in this case and afforded the protection of the rent law” (Greenberg v Colonial Studios, 279 App Div, supra, at 555).
The plaintiff offers no distinguishing feature to render the Greenberg holding inapplicable here. Indeed, the position of a former proprietary lessee is stronger now. In 1951, when Greenberg (supra) was decided, tenants were protected by the State’s emergency rent laws as enacted in 1946 (McKinney’s Uncons Law of NY § 8581 et seq.), which made no specific reference to buildings owned cooperatively; nor did the current General Business Law provision protecting the status of nonpurchasing tenants (General Business Law § 352-eeee [2] [c] [ii]) exist at that time. Now, however, the rent laws in effect in New York City provide greater protection to all prior proprietary lessees than they did in 1951. This is so since the wording of the Rent Stabilization Law and Rent Stabilization Code indicate that any time a multiple dwelling is not owned as a cooperative or condominium (or other enumerated special status) its tenants are protected under these rent laws. The Rent Stabilization Law states:
"This law shall apply to:
"(a) Class A multiple dwellings not owned as a cooperative or a condominium” (Administrative Code of City of New York § 26-504). The Rent Stabilization Code also explicitly provides that it applies to
"all * * * housing accommodations * * * except the following accommodations for so long as they maintain the status indicated below * * *
"(l) housing accommodations contained in buildings owned as cooperatives” (9 NYCRR 2520.11 [emphasis added]). By the use of this language of exemption it follows that as soon as a multiple dwelling is no longer owned as a cooperative, the Rent Stabilization Law and Code again automatically become applicable to it. Those occupants who were formerly proprietary lessees therefore stand in the same position as the renters, and may not be ousted except in accordance with the Rent Stabilization Law.
*572 Again, the protection applies only to those occupants who have not defaulted in payment of their rent. When a foreclosure action is pending and a receiver has been appointed, the proprietary lessees, having an agreement to pay a set amount monthly to the owner — the cooperative corporation — continue to be required to turn that set amount, the maintenance charges, over to the receiver (see, Prudence Co. v 160 W. 73d St. Corp., 235 App Div 543 [1st Dept 1932], affd 260 NY 205). Of course, when the proprietary lease is cut off by the foreclosure sale, and the occupants remain in possession not pursuant to any agreement with the owner but solely by virtue of the emergency rent laws, the issue of what amount the occupants owe in exchange for the use of the premises is an open question, best addressed to the agency which administers the rent laws. However, here the landlord asserts that none of the defendant shareholders have paid use and occupancy.
Certain of the shareholders of the cooperative defaulted on this application: Lynn Fagan and Fagan Associates, who assertedly owe $24,583.50, Omar Jamen Hernandez, allegedly in arrears amounting to $5,098.80, Linda Prince, allegedly owing $7,250, John Raybin, who is said to owe $25,797.50, and Eric Stevens, purportedly in arrears of $25,126. As to them, the landlord’s allegations of nonpayment are unrefuted, and the Rent Stabilization Law therefore presents no bar to their ouster. Accordingly, the plaintiff’s application for an order in the nature of a writ of assistance is granted as to them.
As to shareholders Gerald and Barbara Levin and James and Marilyn Marinaccio, who have opposed the present application, it is alleged by the plaintiff that the Marinaccios are in arrears in the amount of $13,657.50 and the Levins in the amount of $11,472.32, and further, that the Marinaccios are not protected by the Rent Stabilization Law since they use their apartment as commercial premises and maintain a primary residence elsewhere. Neither couple has denied nor refuted the claim of nonpayment. Accordingly, since they too are not protected by the rent laws, the writ is granted as to them as well.
Presented by separate motion of the receiver to settle his final account are several issues to which the law fails to offer settled answers:
(1) do the "sums received and disbursed” upon which a receiver is paid a commission (CPLR 8804) include (a) tenants’ security deposits and (b) the cooperative’s $30,000 reserve fund *573 which had been turned over to the receiver at the commencement of this action? and
(2) who is entitled to be paid the reserve fund upon discharge of the receiver in a co-op mortgage foreclosure?
In one case regarding tenant security deposits, the court declined to include those deposits in the receipts upon which to base the calculation of the commission that would be paid to the receiver (see, New York Bank for Sav. v Jamaica Towers W. Assocs., 49 Misc 2d 230, 231 [Sup Ct, Queens County 1966, Tessler, J.]). The decision does not explain its reasoning for excluding security deposits, except to the extent of calling them trust funds, by which it may be inferred that they were excluded because they were not funds which the receiver was entitled to disburse, but were rather held in trust for those tenants. This reasoning is sound, and will be adopted here.
The issue of whether a cooperative’s reserve fund, turned over to and held by the receiver, should be included in the funds he received and disbursed has to my knowledge never been addressed. Upon consideration, I find no rationale to exclude such funds — unlike tenant security deposits, a reserve fund may be spent, although only in specifically delineated circumstances. Absent any other known limitation to the definition of "sums received and disbursed” in CPLR 8004, I conclude that those sums should be considered as including the reserve fund turned over to the receiver here.
As to the question of what percentage of receipts the receiver is entitled to for commissions, the petitioner contends that the 5% maximum commission permissible under CPLR 8004 and requested by the receiver is not justified in this matter.
Where day-to-day management was performed by a managing agent who was compensated out of the building’s receipts (see, Independent Props. Co. v Mast Prop. Investors, 148 AD2d 849 [3d Dept 1989]), courts have sometimes held that a receiver is not entitled to the statutory maximum as commissions. The plaintiff here notes that the receiver paid to a managing agent and to landlord-tenant counsel a total of $34,531, and asserts that the receiver should not be awarded the full 5% commission, but should be limited to $4,229.50.
However, it should be kept in mind that this matter presented unusual responsibilities for the receiver. It involved one of the first foreclosures of an underlying mortgage on a residential cooperative since the enactment of the Rent Stabi *574 lization Law and the General Business Law’s provisions regarding cooperative conversions. Because of that, the receiver’s dealings with the building occupants became more complex and time-consuming than is generally the case. At the court’s direction, the receiver attended the multitude of conferences and court appearances scheduled in this matter. Moreover, he attended numerous meetings with the Attorney-General’s office held in an attempt to resolve to the mutual benefit of all concerned parties the many issues arising out of this co-op foreclosure. He also attended a DHCR proceeding involving claims regarding the conditions of the building— which conditions may, in fact, have been partly attributable to plaintiff as a prior owner.
The receiver brought to this unique matter a high degree of expertise in the area and so was able to offer substantial assistance in all aspects of the case. He has practiced in the area of real estate law for over 20 years, and is a member of the Real Property Section of the New York State Bar Association, the Special Committee on Cooperatives and Condominiums of the Association of the Bar of the City of New York and serves on a subcommittee examining problems of residential cooperatives, including mortgage defaults and insolvency matters. He has also lectured extensively at seminars sponsored by local Bar associations and the Practicing Law Institute.
Because of his extensive experience and knowledge, the receiver spent hours of his own and his firm’s time at the many hearings and conferences in this and the related proceedings during his receivership, attempting to accomplish a "work-out” without the need for judicial determination. The only counsel fees paid out of the receiver’s accounts to date were for the landlord-tenant proceedings he was obligated to commence, and for plaintiff’s counsel in a tax certiorari matter — for which, it should be noted, plaintiff’s counsel was paid a fee of $5,129.49.
Under these circumstances, I believe the receiver is more than justified in seeking the maximum allowable commission of 5%, which comes to $10,063. Moreover, in view of the substantial legal work performed by the receiver’s firm, his application for permission to retain his firm as counsel is granted nunc pro tune, and his request for legal fees of $10,000 to his firm is granted to the extent of awarding it $2,500. Accordingly, the receiver’s application to be discharged and for judicial settlement of his final accounting is granted, and he is awarded a commission of $10,063 in addition to $791 *575 due for disbursements, and the firm of Fishbach Hertan & Reis is awarded fees of $2,500.
In addressing the novel issue of how the receiver should disburse the reserve fund, the purpose of such a fund should be kept in mind. The creation of a reserve fund is dictated by Administrative Code of the City of New York § 26-703 (a), which requires the sponsor to transfer to the cooperative corporation "a reserve fund to be used exclusively for making capital repairs, replacements and improvements necessary for the health and safety of the residents of such buildings.” The purpose of the fund is to protect the new owner of the building — the corporation — by providing insurance against the event that major building-wide repair work is required. It is not to enrich the corporation or its shareholders, in that it may not be used for any other purpose. If the fund were turned over to the now assetless corporation, it could do nothing to serve its purpose, but could only be distributed to the shareholders — a nice gesture, considering the loss of their investment, but not fulfilling the purpose of the fund. Inasmuch as Mrs. De Santis has the obligation to maintain a safe building, which she must pay for out of her own pocket if receipts from the rent are insufficient to cover it, the better disbursement of the reserve fund is to the plaintiff.
Moreover, the receiver has demonstrated that of the expenditures he made, $20,772.50 could properly have been paid out of the reserve fund. Had that been done, the same amount would remain in general receipts to be turned over to Mrs. De Santis. Consequently, to that extent the turnover of the $30,000 to Mrs. De Santis is especially appropriate.
Finally, counsel for the answering shareholders offer no support in law for the application to be reimbursed for the counsel fees expended by the corporation, and as the court finds no such authority, the application is denied.