**FEDERAL HOME LOAN MORTGAGE CORPORATION, Plaintiff,**

v.

**NEW YORK STATE DIVISION OF HOUSING AND COMMUNITY RENEWAL, Defendant.**

No. CV–93–3717.

United States District Court, E.D. New York.

June 3, 1994.

Richard S. Fischbein, Kenneth G. Schwarz, Pamela A. Phillips, Fischbein Badillo Wagner & Itzer, Mitchell A. Rothken, Sr. Counsel, FHLMC, New York City, for plaintiff.

Gary R. Connor, Karen S. Smith, Marissa Piesman, Asst. Attys. Gen., New York City, for defendant.

### MEMORANDUM AND ORDER

GLASSER, District Judge:

The parties to this declaratory judgment action seek a judicial determination regarding whether an apartment dwelling that was subject to New York's rent stabilization law prior to the building's conversion to cooperative ownership reverts back to rent regulatory status upon the demise of the cooperative. Plaintiff has moved for summary judgment pursuant to Fed.R.Civ.P. 56, while defendant has cross-moved for summary judgment. For the reasons set forth below, plaintiff's motion is denied and defendant's cross-motion is granted.

### FACTS

Plaintiff Federal Home Loan Mortgage Corporation ("FHLMC") is a federally chartered corporation that was created by Congress for the purpose of providing liquidity to the mortgage market; FHLMC generally serves this purpose by purchasing investment quality mortgages from primary lenders, packaging the mortgages as securities and selling the securities to investors. Affirmation of Mitchell A. Rothken, Dated Dec. 1,

1993 ("Rothken Affirm.") ¶ 2. Defendant New York State Division of Housing and Community Renewal ("DHCR") is an executive agency of the State of New York that is responsible for the administration and enforcement of the rent regulatory laws of the City and State of New York. Def.'s 3(g) Statement ¶ 1.

On July 28, 1986, FHLMC became the holder of a first mortgage lien in the amount of $1.45 million (the "underlying mortgage") on a multi-family apartment dwelling located at 101 Lincoln Road, Brooklyn, New York (the "Building"). Pl.'s 3(g) Statement ¶¶ 2–3; Def.'s 3(g) Statement ¶ 8. It is undisputed that at the time FHLMC acquired its mortgage lien, the Building was a rental building subject to the provisions of the New York City Rent Stabilization Law, N.Y. City Admin.Code §§ 26–501 et seq. (the "RSL"). Pl.'s 3(g) Statement ¶ 4; Affidavit of Karen L. Smith, Sworn to Jan. 28, 1994 ("Smith Aff.") ¶ 1 n. 5.

### A. The Conversion to Cooperative Ownership

Subsequent to FHLMC's acquisition of the mortgage lien, the Building was converted to cooperative ownership in accordance with the provisions of N.Y.Gen.Bus.Law § 352–eeee, also known as the Martin Act. Rothken Affirm. ¶ 4. As required under the Martin Act, prior to the conversion, a Cooperative Offering Plan (the "Plan") setting forth the terms of the offering was drafted and submitted to the New York State Department of Law for approval. See N.Y.Gen.Bus.Law § 352–e. The Plan was accepted for filing on April 27, 1988, and was declared effective by the Attorney General on July 11, 1989. Def.'s 3(g) Statement ¶¶ 3, 5. Title to the Building thereafter passed from the sponsor[1] to a cooperative apartment corporation named 101 Lincoln Tenants Corporation (the "Tenants Corp.") on November 15, 1989,[2] and

shares of stock in the Tenants Corp. were allocated in varying amounts to all of the apartments in the Building. Rothken Affirm. ¶ 5.

On April 27, 1988, the Plan also was presented to all tenants in occupancy at the Building, who were given the option to purchase the shares allocated to their respective units. Rothken Affirm. ¶ 5. The Plan expressly stated that tenants who chose to purchase the shares allocated to their apartments would be issued long-term proprietary leases, which would supercede their existing leases. Rothken Affirm. ¶ 14; Smith Aff. ¶ 8. It also informed potential purchasers that the Building was subject to the underlying mortgage, and that at the time of conversion, the Tenants Corp. would execute a $2 million wrap-around mortgage to be held by the Sponsor. Pl.'s 3(g) Statement ¶ 9 & Rothken Affirm.Ex. B at 127, 148, 164. The Plan explained that the wrap-around mortgage payments received from the Tenants Corp. would be used to pay the underlying mortgage, Rothken Affirm.Ex. B at 200, and that in the event of a default by the Tenants Corp. on the mortgage payments, the lender had the right to demand immediate payment of the entire amount due under the mortgage and to institute a foreclosure action. Rothken Affirm. ¶ 9 & Ex. B at 196–97. In addition, the Plan advised that a proprietary lessee's default on any of a number of obligations set forth in the proprietary lease would result in the termination of the purchaser's proprietary lease, and the concomitant loss of the purchaser's investment. Rothken Affirm. ¶ 10 & Ex. B at 328–30; Def.'s 3(g) Statement ¶ 12. However, the Plan did not specify whether or not a purchasing tenant would regain the protections of the RSL in the event of the dissolution of the cooperative. Def.'s 3(g) Statement ¶ 12.

Three tenants chose to purchase their apartments, while seventeen of the eighty-

---

**1.** The original sponsor was a New York general partnership named 50 Realty Co. Under the first amendment to the Plan, Aaron Ziegelman (the "Sponsor") became the sponsor for the Plan. Def.'s 3(g) Statement ¶ 4.

**2.** At the time of the closing, the Tenants Corp. consisted of twenty non-Sponsor related share-

holders and the Sponsor, who owned the shares allocated to the remaining sixty-three apartments. Subsequent to the closing, three tenants purchased their units. Def.'s 3(g) Statement ¶ 6; Affidavit of Stevenson Stewart, Sworn to Jan. 20, 1994 ("Stewart Aff.") ¶ 4.

three other units in the Building were sold to persons who did not reside in the Building prior to conversion.[3] Smith Aff. ¶¶ 4–6 & Ex. E. Defendant maintains "on information and belief" that the purchase prices of the apartments ranged from $66,000 to $110,000, and that all of the proprietary lessees purchased their units with 90% financing offered by the Sponsor. Smith Aff. ¶ 7 & Ex. F; Stewart Aff. ¶ 5. Because the Plan was a "non-eviction plan," as defined in the Martin Act, N.Y.Gen.Bus.Law § 352–eeee(1)(b), those tenants who elected not to purchase their units and continued to live in the Building maintained their rent stabilized status.[4] Rothken Affirm. ¶ 15 & Ex. B at 205. It is undisputed that during the period when the Building was converted to cooperative ownership, with the exception of the non-purchasing tenants, "the apartments were freed from the constraints of rent regulation." Rothken Affirm. ¶ 16.

It also bears noting, and counsel acknowledged at oral argument on May 13, 1994, that at the time the Building was converted to cooperative ownership, FHLMC—the mortgagee—had the right to demand payment of the principal and interest then due, but elected not to do so. Tr. 18–19. Rather, FHLMC approved the conversion on November 16, 1989. See Smith Aff.Ex. H. Moreover, no additional indebtedness was added to the underlying mortgage before, during or after the conversion. Smith Aff. ¶ 16.

B. *The Default by the Tenants Corp.*

Subsequent to the conversion, a Board of Directors (the "Board") comprised of elected proprietary lessees was established to operate and maintain the Building. Pl.'s 3(g) Statement ¶ 15; Rothken Affirm. ¶ 6. Defendant alleges that the Sponsor controlled the Board by appointing a majority of its members; in addition, the Sponsor controlled Zeal Management Co., the entity that acted as managing agent for the Building. Def.'s 3(g) Statement ¶ 13; Smith Aff. ¶ 18. While plaintiff maintains that the Board breached its duty to set and collect maintenance charges in an amount sufficient to pay the mortgage, causing the Tenants Corp. to default on its mortgage payments in early 1991, Pl.'s 3(g) Statement ¶¶ 16–17, defendant attributes the default to the Sponsor's failure to make his maintenance payments. Def.'s 3(g) Statement ¶ 14. Moreover, defendant submits that "the other non-sponsor shareholders knew nothing about either the sponsor default on the maintenance nor [sic] the apartment corporation's default on the mortgage until they were served with foreclosure papers on or about May 28, 1991." Def.'s 3(g) Statement ¶ 15; Smith Aff. ¶ 21.

In any event, it is undisputed that FHLMC commenced a mortgage foreclosure action in this court in May 1991. On plaintiff's application, in June 1991, a receiver was appointed to manage the Building.[5] Def.'s 3(g) Statement ¶ 16. A judgment of foreclosure was entered by the court on October 8, 1991 in the amount of $1,599,197, which later was adjusted to $1,805,416, inclusive of interest and fees. Rothken Affirm.Ex. C & Pl.'s 3(g) Statement ¶ 19. A foreclosure sale was conducted in June 1993, at which time FHLMC purchased the Building.[6] Rothken Affirm. ¶ 17.

The parties agree that upon the foreclosure sale, the proprietary leases were cancelled; as a result, the purchasers ceased owning the shares allocated to their apart-

---

**3.** While FHLMC alleges that four tenants purchased their units and twenty-one other units were sold to "outsiders," Rothken Affirm. ¶ 14 & n. 2, the Eighth Amendment to the Plan corroborates the figures alleged by DHCR.

**4.** Both parties agree that the rights of the non-purchasing tenants will not be affected by this lawsuit.

**5.** Specifically, defendant alleges that at the request of FHLMC, Robert D'Loren was appointed as receiver for the Building; D'Loren, in turn, appointed Trebold Asset Management Co. ("Tre-

bold") to run the building. Smith Aff. ¶ 25. Defendant further alleges that Trebold failed to perform its duties by failing to collect rent and maintenance and to make repairs, and that as a result, the Tenants Corp. lacked sufficient funds to pay any part of its mortgage. Smith Aff. ¶¶ 26–27; Stewart Aff. ¶¶ 8–10.

**6.** Although the foreclosure sale originally was scheduled for April 1992, the sale was delayed due to the filing of an involuntary bankruptcy petition against the Tenants Corp. in April 1992. Rothken Affirm. ¶ 17.

ments, but remained liable on the personal loans they took out to purchase those shares. Def.'s 3(g) Statement ¶ 18. At the time of the sale and currently, there are approximately five vacancies in the Building and approximately fifteen apartments that are occupied by former purchasers. Def.'s 3(g) Statement ¶ 19; Stewart Aff. ¶ 13. From the date of the foreclosure sale to the present, FHLMC neither has provided renewal leases to these purchasers nor attempted to collect rent from them. Def.'s 3(g) Statement ¶ 19. FHLMC maintains that it is not in the business of owning and operating residential apartment buildings, and moreover, that it has been unable to run the Building because it does not know what rent to charge for the units that were freed from rent regulation when the Building was converted to cooperative ownership. Rothken Affirm. ¶¶ 19–20. As a result, the Building is not generating the revenue required to cover its operating expenses. Rothken Affirm. ¶ 21. FHLMC alleges that "[i]n light of these problems [it] desires to sell the Building as soon as possible so that it can satisfy the $1,805,416 judgment it obtained against the Tenants Corp. and devote its attention to accomplishing its intended purpose of facilitating home ownership." Rothken Affirm. ¶ 22. FHLMC accordingly commenced this action by Complaint filed August 17, 1993, seeking a ruling as to whether the RSL again became applicable to the Building upon the foreclosure. FHLMC now moves for summary judgment pursuant to Fed.R.Civ.P. 56 "because the issue is solely one of law," Pl.'s Mem. at 8; DHCR, in turn, cross-moves for summary judgment.

### DISCUSSION

This court is called upon to interpret New York law in an area about which the New York Court of Appeals has not yet spoken. However, because FHLMC is the plaintiff in these proceedings, the action properly is before this court pursuant to 12 U.S.C. § 1452(f).[7]

Plaintiff's argument essentially is as follows: because the RSL provides that a building owned as a cooperative is exempt from the RSL, and because there is no statutory provision addressing a change of a building's status from cooperative back to non-cooperative, once a building becomes exempt from the RSL, it remains exempt. Defendant alleges, by contrast, that all units in the Building and in comparable buildings that were subject to the RSL prior to conversion to cooperative ownership revert to rent regulatory status upon dissolution of the cooperative, whether by foreclosure or other means. While the court finds interesting the notion that a formerly exempt building, like a "phoenix arising from the ashes," reverts back to rent stabilized status, as discussed below, an analysis of the language of the applicable statutory provisions, as well as their underlying history and purpose, reveals that the interpretation urged by plaintiff is not a viable one. Thus FHLMC's motion for summary judgment is denied, and DHCR's cross-motion for summary judgment is granted.

### I. Relevant Statutory Provisions

The legislative history of the RSL, including recent developments in the law, recently was described by the New York Court of Appeals as follows:

> In response to what it found to be a severe housing shortage following World War II, the legislature enacted laws providing for rent control, and, later, rent stabilization. Perceiving that continuing need throughout the ensuing decades, the legislature has periodically extended rent regulation to the present day, most recently providing for deregulation only of apartments with monthly rents in excess of $2,000 (see, Rent Regulation Reform Act of 1993, L.1993, ch. 253 [extending rent control and rent stabilization until June 15, 1997]).

*Rent Stabilization Ass'n of N.Y. City, Inc. v. Higgins,* 83 N.Y.2d 156, 164–65, 630 N.E.2d

---

7. The relevant portion of 12 U.S.C. § 1452(f) reads as follows:

Notwithstanding section 1349 of Title 28 or any other provision of law, ... (2) all civil actions to which [FHLMC] is a party shall be

deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions, without regard to amount or value. . . .

626, 628, 608 N.Y.S.2d 930, 932 (1993), *petition for cert. filed*, 62 U.S.L.W. 3659 (U.S. Mar. 21, 1994).[8] The Court of Appeals further explained that in 1983, the legislature designated DHCR the administrative agency responsible for administering the regulation of rents under the rent control and rent stabilization laws. *Id.* In 1985, the legislature granted DHCR additional authority to amend the Rent Stabilization Code, N.Y.Comp.Codes R. & Regs. tit. 9 §§ 2520 *et seq.* (the "Code"). Pursuant to this grant of authority, DHCR enacted the current version of the Code—applicable to the present case—in May 1987. *Id.* at 165, 630 N.E.2d at 629, 608 N.Y.S.2d at 933; N.Y.Comp.Codes R. & Regs. tit. 9 § 2520.1.

Hence all rents for eligible apartments in New York City currently are subject to regulation under the RSL and the Code. As relevant to the present case, the RSL generally is applicable to "Class A multiple dwellings *not owned as a cooperative* or condominium . . . containing six or more dwelling units which: (1) were completed after February first, nineteen hundred forty-seven . . . ." N.Y.City Admin.Code § 26–504 (emphasis added). The Code, in turn, applies to

> all or any class or classes of housing accommodations made subject to regulation pursuant to [the RSL] . . . except the following housing accommodations *for so long as* they maintain the status indicated below . . . (*l*) housing accommodations contained in buildings owned as cooperatives or condominiums . . . .

N.Y.Comp.Codes R. & Regs. tit. 9 § 2520.-11(*l*) (emphasis added).

### A. *Interpretation of the Provisions by New York State Courts*

Both parties agree that the only case interpreting these provisions in the same context as the present action is *De Santis v. White Rose Assocs.*, 152 Misc.2d 567, 578 N.Y.S.2d 363 (N.Y.Sup.Ct.1991), a decision by the New York State Supreme Court. In that case, plaintiff Angela De Santis owned three brownstones in Manhattan until 1988, when she sold them to defendant White Rose Associates and took back a $2.5 million purchase-money mortgage. Because White Rose was able to sell only seven of the twenty-four apartments in the brownstones, and the remaining apartments were occupied by rent stabilized tenants whose monthly rent payments were substantially less than the monthly maintenance charge on the apartments, White Rose ultimately was unable to cover its mortgage payments to De Santis. De Santis instituted a foreclosure proceeding and bought back title to the brownstones. She subsequently commenced suit in the New York State Supreme Court, New York County, seeking an order putting her in possession of the apartments and directing the sheriff to remove the former cooperative owners and rental tenants. In response, the cooperative owners claimed that upon the foreclosure sale, they resumed or reverted back to rent stabilized status.

The court determined that based on the relevant case law and the rent laws and regulations, the rental tenants could not be ousted as long as they continued to pay rent. *Id.* at 570, 578 N.Y.S.2d at 365 (*citing Da Costa v. Hamilton Republican Club of Fifteenth Assembly Dist.*, 187 Misc. 865, 65 N.Y.S.2d 500 (N.Y.Sup.Ct.1946); *Pisani v. Cominger*, 36 A.D.2d 593, 318 N.Y.S.2d 913 (1st Dep't 1971)). With respect to the status of the former proprietary lessees, the court relied on the case of *Greenberg v. Colonial Studios*, 105 N.Y.S.2d 494 (N.Y.Sup.Ct.), *rev'd*, 279 A.D. 555, 107 N.Y.S.2d 87 (1st Dep't 1951), and the language of the RSL and the Code to conclude that these occupants stood in the same position as the renters and could not be ousted, except in accordance with the RSL. *De Santis*, 152 Misc.2d at 571, 578 N.Y.S.2d at 367.

In *Greenberg*, nine of the thirty-seven apartments in a cooperative apartment dwelling were allocated to shareholders, while the other units were occupied by renters. The first mortgagee commenced a foreclosure action and moved by writ of assistance to remove the nine former proprietary lessees. Reversing the decision of the trial court, the Appellate Division held—somewhat obliquely—that the cooperative owners "should be treated as tenants in the circumstances pre-

---

**8.** The legislative history of the RSL is discussed at greater length below, *see* section IV, *infra.*

sented in this case and afforded the protection of the rent law." *Greenberg,* 279 A.D. at 555, 107 N.Y.S.2d at 87.

After reviewing the decision in *Greenberg,* the *De Santis* court noted that the plaintiff "offer[ed] no distinguishing feature" to render the holding in *Greenberg* inapplicable.[9] Even more significantly, the court looked to the language of the RSL and the Code quoted above and concluded that "[b]y use of this language of exemption it follows that *as soon as a multiple dwelling is no longer owned as a cooperative, the Rent Stabilization Law and Code again automatically become applicable to it.*" *Id.* at 571, 578 N.Y.S.2d at 367 (emphasis added).[10]

■ While this court is not bound to follow *De Santis,* which is a lower state court decision, the Second Circuit has recognized that "[w]here the high court [of the state] has not spoken, the best indicators of how it would decide are often the decisions of lower state courts." *In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 850 (2d Cir. 1992) (*citing Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967)). In any event, and as discussed below, based on its own analysis of the language and purpose of the statute and regulations at issue, this court concludes that the New York Court of Appeals would concur with the result reached by the *De Santis* court.

## B. *Statutory Construction*

### 1. *Words of the Statute*

■ It is an elementary rule of statutory construction that a court must begin with the language of the statute. *See* Hon. Felix Frankfurter, *Some Reflections on the Reading of Statutes,* Sixth Annual Benjamin N. Cardozo Lecture delivered before the Association of the Bar of the City of New York, Mar. 18, 1947 (*reprinted in* 47 Colum.L.Rev.

527, 529 (1947)). As Justice Frankfurter explained:

> Though we may not end with the words in construing a disputed statute, one certainly begins there. You have a right to think that a hoary platitude, but it is a platitude not acted upon in many arguments.... We must, no doubt, accord the words the sense in which Congress used them.... And so we assume that Congress uses common words in their popular meaning, as used in the common speech of men.

*Id.* at 535–36; *see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.").

Beginning with the words of the disputed statute, the court finds that the language of the RSL makes clear that the applicability or nonapplicability of its provisions is predicated upon the present status of the building: the RSL is applicable to specified dwellings "not owned as a cooperative...." N.Y.City Admin.Code § 26–504. FHLMC is correct, as far as it goes, that a court cannot amend a statute by inserting words that are not there. However, that danger is not present in this case. In this case, the RSL specifically states that its provisions are not applicable to cooperatives or condominiums. Merely because the statute does not expressly anticipate the situation where an apartment dwelling that is subject to the RSL is converted to cooperative ownership and then reverts back to non-cooperative status does not mean that there is an omission in the statute. Rather, the language of the provision is clear and unambiguous: the RSL does not apply to dwellings owned as a cooperative or a condo-

---

9. FHLMC's efforts to distinguish *De Santis* on the ground that *Greenberg* and the other cases relied upon in the decision antedated the RSL are unavailing; rather, the *De Santis* court expressly noted that "the rent laws in effect in New York City provide greater protection to all prior proprietary lessees than they did in 1951." *De Santis,* 152 Misc.2d at 571, 578 N.Y.S.2d at 367.

10. The fact that the court's holding in *De Santis* was contingent upon the payment of rent by the tenants seeking the protection of the RSL and the Code has no bearing on this case: there has been no default by the former proprietary lessees in this case because FHLMC neither has provided renewal leases to nor attempted to collect rent from these tenants.

minium. The Building that is the subject of this action is not presently under cooperative ownership; the fact that it formerly was does not change its present status.

### 2. *Construction of the Code*

This interpretation of the RSL is supported further by the language of the Code, which was promulgated and adopted by DHCR. As mentioned above, the relevant section of the Code states that its provisions apply to all housing accommodations except for, *inter alia,* cooperatives, "for so long as" the buildings maintain their status as cooperatives. N.Y.Comp.Codes R. & Regs. tit. 9 § 2520.11(*l* ). The inclusion of the "for so long as" language in the regulation indicates that DHCR interpreted the RSL as creating *temporary* exemptions from rent regulation, and elected to specify in the Code that once the exemption ends, the building again becomes subject to regulation.

FHLMC's argument that DHCR exceeded its power in promulgating this provision of the Code is unpersuasive. First, it bears noting, and New York courts have recognized, that DHCR's interpretation of statutes which it administers—like the RSL and the Code—is entitled to great deference, and the court may not substitute its judgment for that of the agency. *Ansonia Residents Ass'n v. New York State Div. of Hous. and Community Renewal,* 75 N.Y.2d 206, 213, 551 N.E.2d 72, 74, 551 N.Y.S.2d 871, 873 (1989); *Salvati v. Eimicke,* 72 N.Y.2d 784, 791, 533 N.E.2d 1045, 537 N.Y.S.2d 16 (1988) ("DHCR's interpretation of the statutes it administers, if not unreasonable or irrational, is entitled to deference."). The standard of review for a challenge to a regulation is a high one: the challenger must establish that the regulation " 'is so lacking in reason for its promulgation that it is essentially arbitrary.' " *Versailles Realty Co. v. New York State Div. of Hous. and Community Renewal,* 76 N.Y.2d 325, 328, 558 N.E.2d 1009, 559 N.Y.S.2d 472 (1990) (citation omitted). FHLMC utterly has failed to show that the regulation is unreasonable, irrational, or essentially arbitrary, and this court therefore finds it appropriate to uphold and pay deference to the regulation.

Second, while this court agrees with the general proposition that an agency may not enact a regulation which alters, adds to, extends or limits a statute, *see, e.g., Festa v. Leshen,* 145 A.D.2d 49, 55, 537 N.Y.S.2d 147, 152 (1st Dep't 1989), it does not agree that the Code provision runs afoul of this principle by "changing" the law as set forth in the RSL; rather, the Code provision is consistent with and to some extent clarifies the text of § 26–504 of the RSL. The cases FHLMC relies upon in support of its argument are distinguishable. For example, in *Trump–Equitable Fifth Ave. Co. v. Gliedman,* 62 N.Y.2d 539, 467 N.E.2d 510, 478 N.Y.S.2d 846 (1984), the New York Court of Appeals held invalid a regulation promulgated by the Department of Housing Preservation and Development because the regulation "directly contravene[d] the plain words of" the statute by improperly adding a requirement—that land be "substantially" under-utilized, rather than only under-utilized—to the regulation. Similarly, in *Boreali v. Axelrod,* 71 N.Y.2d 1, 517 N.E.2d 1350, 523 N.Y.S.2d 464, 470 (1987), the Court of Appeals struck down regulations governing smoking in public places where the promulgating agency "did not merely fill in the details of broad legislation describing the over-all policies to be implemented," but rather promulgated its own regulations in the face of legislative inaction, and "wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance." *See also Two Assocs. v. Brown,* 127 A.D.2d 173, 513 N.Y.S.2d 966, 972 (1st Dep't 1987) (finding invalid DHCR's promulgation of "Emergency Bulletin" which "in effect, legislat[ed] a new class of persons entitled to a renewal lease."). By contrast, in this case, because the RSL clearly exempts from its coverage accommodations "not owned as a cooperative," and the Code does not alter the statute by specifying that the exemption applies "for so long as" a building is maintained as a cooperative, the regulation "merely fill[s] in the details" of the statute, and is not invalid. *Accord Higgins,* 83 N.Y.2d at 170, 630 N.E.2d at 631, 608 N.Y.S.2d at 935 (DHCR acted properly in redefining class of "family members" entitled to succeed to tenancy in a rent regulated apartment; "[a]djustment of the existing

scheme in light of the agency's technical competence [was] well within the proper rule-making function" of the agency).

Finally, this court takes note of the general principal that "since rent-control laws are remedial in nature and designed to promote the public good, their provisions should be interpreted broadly to effectuate their purposes." *Braschi v. Stahl Assocs. Co.*, 74 N.Y.2d 201, 208, 543 N.E.2d 49, 52, 544 N.Y.S.2d 784, 787 (1989); *see also McMurray v. New York State Div. of Housing and Community Renewal*, 135 A.D.2d 235, 524 N.Y.S.2d 693, 695 (1st Dep't) ("[P]rovisions affording protections to tenants are to be liberally construed as implementing the purposes for which the rent laws were enacted while provisions excluding a tenant from possession were to be strictly construed as running counter to the purpose of the rent laws."), *aff'd*, 72 N.Y.2d 1022, 531 N.E.2d 645, 534 N.Y.S.2d 924 (1988); *Festa*, 145 A.D.2d at 55, 537 N.Y.S.2d at 152 ("[R]emedial statutes and regulations designed to promote the public good should be liberally construed."). This principle lends further support to the validity of the provision of the Code and the construction of the RSL urged by DHCR.[11]

### 3. *Setting of Initial Regulated Rent*

■ FHLMC contends that its interpretation of the RSL is supported further by the fact that the RSL and the Code lack a mechanism for setting the initial regulated rent for units in a cooperative building that reverts back to a rental building. Because these laws contain rent formulas for a variety of other housing accommodations, FHLMC argues, the absence of a specific provision governing former cooperative buildings is evidence that the legislature did not intend these buildings to revert to rent regulatory status.

Section 26–512(b) of the RSL provides, in relevant part, as follows:

b. The initial regulated rent for housing accommodations subject to this law on the local effective date of the emergency tenant protection act of nineteen seventy-four or which become subject to this law thereafter, pursuant to such act, shall be:

(3) For housing accommodations other than those described in paragraphs one and two of this subdivision, the rent reserved in the last effective lease or other rental agreement.

N.Y.City Admin.Code § 26–512(b); *see also* N.Y.Comp.Codes R. & Regs. tit. 9 § 2521.1 (setting initial legal registered rents for housing accommodations). Owners found to have collected a rent overcharge may be subject to sanctions pursuant to § 26–516 of the RSL. *See* N.Y.City Admin.Code § 26–516; *see also* N.Y.Comp.Codes R. & Regs. tit. 9 § 2526.1 (setting forth sanctions for rent overcharges). FHLMC contends that the initial regulated rent provisions do not govern in this case because the "last effective lease" for each of the units was a proprietary lease which did not specify any rent and which had a term far longer than the one or two year term ordinarily found in residential leases; notwithstanding this lack of guidance, FHLMC asserts, it unfairly would be subjected to the risk of sanctions under the RSL and the Code if it were found to have collected a rent overcharge.

DHCR concedes that currently there is no set formula for determining the initial rents for units in a cooperative building that has lost its cooperative status. Reply Affidavit of Karen S. Smith in Support of Defendant's Cross–Motion for Summary Judgment,

11. The court does not find persuasive DHCR's argument that "[t]he Legislature, by not choosing to amend the applicable provisions of the law and regulation has implicitly acquiesced in their construction as stated" by DHCR. Def.'s Mem. at 19–20. Rather, even though the legislature recently amended the rent regulatory laws by enacting the Rent Regulation Reform Act of 1993, *see* section IV, *infra*, the question of the interpretation of the relevant provisions of the RSL and the Code was not specifically before the legislature, and the legislature's inaction with respect to these provisions cannot be deemed acquiescence in DHCR's interpretation of them. Moreover, as FHLMC points out, the legislature's "inactivity" has not "continued in the face of a prevailing statutory construction," *Brooklyn Union Gas Co. v. New York State H.R.A. Bd.*, 41 N.Y.2d 84, 359 N.E.2d 393, 390 N.Y.S.2d 884, 889 (1976), because the New York Court of Appeals has not yet interpreted the provisions; therefore, the legislature's inaction is not, at this point, significant. *Id.*

Sworn to Apr. 12, 1994 ("Smith Reply Aff.") ¶ 2. However, DHCR submits that it currently is working on a draft policy titled "Establishment of Legal Stabilized and Maximum Rent Controlled Rents and Determination of Occupancy Rights Where a Cooperative or a Condominium is Deconverted," and that these guidelines should be effective in either June or September 1994. Smith Reply Aff. ¶ 3; Tr. 29. In any event, DHCR maintains that § 26–512(b)(3) of the RSL, quoted above, does provide guidance with respect to the proper amount of the initial regulated rent in this case, because the "last effective leases" were the proprietary leases held by the purchasing tenants. Even more significantly, DHCR points out that the Code currently contains mechanisms for dealing with disputes regarding the setting of initial rents. In relevant part, § 2522.6 of the Code provides as follows:

> Where the legal regulated rent or any fact necessary to the determination of the legal regulated rent ... is in dispute between the owner and the tenant, or is in doubt, or is not known, the DHCR at any time upon written request of either party, or on its own initiative, may issue an order in accordance with the applicable provisions of this Code determining the facts, including the legal regulated rent....

N.Y.Comp.Codes R. & Regs. tit. 9 § 2522.6. DHCR further maintains that counsel for other lending institutions have sought guidance from DHCR with respect to rent levels, *see* Smith Reply Aff.Ex. A, and that DHCR has been able to offer recommendations "pending the formal promulgation of a specific policy aimed at the deconversion of cooperatives and condominiums." Smith Reply Aff. ¶ 6 & Ex. B. *See also Brightwater Towers Assocs. v. New York State Div. of Housing and Community Renewal*, Index No. 11755/91 (N.Y.Sup.Ct. Oct. 8, 1991) (upholding determination made by DHCR with respect to establishment of initial rents). It is undisputed that in this case, FHLMC has not sought a determination from DHCR with respect to what rent to charge for the units in the Building.

The court agrees with DHCR that there are adequate mechanisms in place for determining what initial regulated rent to charge for units in a building no longer under cooperative ownership;[12] FHLMC simply has failed to avail itself of those mechanisms in the present case. The absence of a specific provision in the RSL and the Code setting the rent for such buildings accordingly does not leave FHLMC or similarly situated mortgage lenders without a remedy or mean that the legislature did not intend these buildings to revert to rent regulatory status.

### 4. *Analogous Code Exemptions*

This analysis is consistent with previous rulings made by DHCR with respect to various buildings and individual apartments which have been exempted or excluded from the rent regulatory laws.[13] For example, according to Joseph A. D'Agosta, the Deputy Commissioner for Rent Administration of DHCR, even though a building owned by a charitable or educational institution is exempt from the rent laws, if the building is sold to a private owner, it loses its exempt status. Affidavit of Joseph A. D'Agosta, Sworn to Jan. 28, 1994 ("D'Agosta Aff.") ¶ 17. Similarly, a building which is excluded from rent regulation because it contains fewer than six units becomes subject to the RSL if a sixth unit is added. D'Agosta Aff. ¶ 17; *see also Gandler v. Rosado*, 138 Misc.2d 740, 525 N.Y.S.2d 132 (N.Y.Civ.Ct.1988) (addition of

---

12. The court also notes that in this case, the section of the Plan titled "Foreclosure—Received [sic] of Rents" would seem to provide another mechanism by which FHLMC could collect rent. This provision states that in the event of foreclosure, the lessee shall pay to the receiver as rent

> the rent for the apartment last determined and established by the Directors prior to the commencement of said action, and such rent shall be paid during the period of such receivership, whether or not the Directors shall have deter-

mined and established the rent payable hereunder for any part of the period during which such receivership may continue.

Rothken Affirm.Ex. B at 336 (emphasis added).

13. According to DHCR, because the examples discussed in the text above are "well accepted interpretations by DHCR of the law and regulations," the interpretations have not been challenged successfully and the cases upholding DHCR's rulings are unreported. Def.'s Mem. at 20 n. 12.

apartment converting building from five family building to six family building subjected premises to RSL). Finally, individual apartments also become subject to rent regulation if their exempt status changes: to illustrate, units occupied by a superintendent or used exclusively for commercial purposes are exempt from the rent laws, but if the superintendent moves out or the commercial use of the apartment ceases, these units become subject to regulation. D'Agosta Aff. ¶ 18. While the court recognizes, as FHLMC points out, that these temporary exemptions are created by provisions other than the section of the RSL at issue in this case, and therefore are not dispositive with respect to the issue before it, it nonetheless finds the foregoing examples persuasive by analogy.

## II. The RTC v. Diamond Decision

In Plaintiff's Reply Memorandum of Law in Support of Motion for Summary Judgment ("Pl.'s Reply"), FHLMC argues that the Second Circuit's recent decision in *Resolution Trust Corp. v. Diamond*, 18 F.3d 111 (2d Cir.), *petition for cert. filed*, 62 U.S.L.W. 3757 (U.S. May 4, 1994), "in its holding, dicta and general tone," supports an interpretation of New York's rent laws that is consistent with the interpretation urged by plaintiff in this case. A close examination of that decision is required.

In *Diamond*, the Second Circuit was asked to decide whether the Resolution Trust Corporation ("RTC") was permitted to disaffirm or repudiate the tenancies in nine rent controlled and rent stabilized apartments pursuant to its statutory powers under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). The nine appellees in *Diamond* were non-purchasing tenants in the subject building, which had been converted to condominium ownership pursuant to a non-eviction plan. *Id.* at 115. The plan offering documents (like the Plan here) stated that these tenants would not be evicted, and that "any rent regulations governing their tenancies would continue to apply after the conversion was complete." *Id.* After the sponsor defaulted, RTC was appointed the receiver of the building; it subsequently determined that the nine tenan-

cies were "burdensome" within the meaning of FIRREA, and informed each tenant that it was repudiating his or her tenancy. *Id.* at 115–16. After the tenants and the New York State Attorney General objected, RTC sought a declaratory judgment that it had the power to repudiate the tenancies in question; the Attorney General and DHCR thereafter claimed that RTC lacked authority to reject the tenancies. *Id.* at 116.

Ruling on the parties' cross-motions for summary judgment, the district court held, *inter alia*, that "because the nine tenants enjoy[ed] 'rights of occupancy created by state statute and independent of any contract or lease between the landlord and tenant,' those rights [could not] be repudiated under 'the plain language' of FIRREA authorizing RTC to repudiate 'any contract or lease.'" *Id.* at 117 (*quoting* 801 F.Supp. 1152, 1161 (S.D.N.Y.1992)). The Court of Appeals disagreed, holding that the tenancies were contractual in nature, and that the rent regulations—including the systems of rent stabilization and rent control and the Martin Act—did not transform the tenancies into "some non-contractual, non-leasehold property interest such that they are outside the scope of [FIRREA]." *Id.* at 118. Specifically, with respect to rent stabilized tenancies, the court noted that the RSL anticipated and required a written lease-contract as the basis for the tenancy. *Id.* at 119 (*citing* 9 N.Y.Comp. Codes R. & Regs. tit. 9 § 2520.12 ("The provisions of any lease or other rental agreement shall remain in force pursuant to the terms thereof, except insofar as those provisions are inconsistent [with the rent regulations] ...")). Therefore, even though statutory provisions altered or restricted important terms of the contract—including the initial rent, rent increases and the right of the tenancy to pass to certain members of the tenant's family upon the vacating of the premises by the tenant—the tenancy still retained "much of the character of a voluntary contract" and was subject to RTC's disaffirmance powers under FIRREA. *Id.* In reaching this conclusion, the Second Circuit remarked that

were we to find that New York law creates "statutory" tenancies not ultimately based on a lease or other voluntary contractual

arrangement, we would have to consider whether such a statutory grant of a property interest amounts to the taking of private property without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. *Id.* at 118. Thus, the court held that the tenancies, as contract-based leaseholds, were subject to the statutory power of RTC to disaffirm or repudiate contracts or leases it determined to be burdensome within the meaning of FIRREA.

Initially, it is important to point out several important aspects of *Diamond* which distinguish it from the present case. First, the central issue in *Diamond* concerned the interplay between state and federal law in the context of interpreting a provision of the FIRREA. The Second Circuit therefore looked to federal law for the definition of "contract or lease," noting that "[a]lthough we are not bound by any state court pronouncements regarding the breadth or scope of these terms, we do consult for guidance the body of New York law concerning the design and operation of the rent regulation programs at issue." *Id.* 18 F.3d at 118. By contrast, there is no federal law at issue here; indeed, this action is before this court only because the federal district courts have exclusive jurisdiction over actions involving FHLMC, a federally chartered corporation. Hence, there is no federal interest at stake here that requires this court to ignore the plain language and intent of § 26–504 of the RSL.

Second, the plaintiffs in *Diamond* were non-purchasing tenants of a building owned as a condominium, whereas the parties whose rights are at issue here are the purchasing tenants of a building formerly owned as a cooperative.[14] The *Diamond* court thus did not expressly rule on the nature of the tenancies of these former proprietary lessees. The former proprietary lessees also are distinguishable from the plaintiffs in *Diamond* by virtue of the fact that prior to the demise of the cooperative, these tenants did have

"contracts" in the form of their proprietary leases. In short, while the atmospherics of the *Diamond* decision initially would seem to commend adoption of the interpretation of the RSL advanced by FHLMC, the facts and issues involved in that case are sufficiently distinct from those in the present case to render its holding inapplicable.

With respect to FHLMC's reliance on *Diamond* for the argument that if the court directs FHLMC to enter into leases with the former proprietary lessees, its order will "run[ ] afoul of the federal Constitution," Pl.'s Reply at 4, in the first place, the court in *Diamond* did not hold that such direction actually would amount to a taking, and in the second place, it is evident that applying § 26–504 of the RSL to the Building would result in neither a physical nor a regulatory taking. In order to effect a physical taking, government action must compel an owner to endure a permanent physical occupation of its property. *Higgins,* 83 N.Y.2d at 171, 630 N.E.2d at 632, 608 N.Y.S.2d at 936 (*citing Yee v. City of Escondido,* —— U.S. ——, ——, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 434–35, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982)). In *Higgins,* in the context of determining that regulations enlarging the class of family members entitled to succeed to a rent regulated apartment upon the death or departure of the tenant of record did not constitute a taking, the New York Court of Appeals held as follows:

> That a rent-regulated tenancy might itself be of indefinite duration—as has long been the case under rent control and rent stabilization—does not, without more, render it a permanent physical occupation of property.... Nor does the fact that an owner must offer a renewal lease to a departed tenant's newly defined family member—potentially a stranger to the owner—give rise to such a physical occupation.

83 N.Y.2d at 172, 630 N.E.2d at 632, 608 N.Y.S.2d at 936 (citations omitted). Rather, the court ruled, notwithstanding the restric-

---

**14.** Indeed, plaintiff has conceded that it is not seeking to affect the rights of the non-purchasing tenants in the Building by this lawsuit.

tions imposed by the rent regulations, the owner still voluntarily was acquiescing in the use of its property for rental housing. *Id.* at 172, 630 N.E.2d at 633, 608 N.Y.S.2d at 937; *see also Dawson v. Higgins,* 610 N.Y.S.2d 200 (1st Dep't 1994) (noting that Court of Appeals has distinguished between regulation that protects current tenant—which generally is permissible—and regulation that subjects the property to a use never intended—which may be a physical taking). In this case, FHLMC voluntarily purchased and agreed to run the Building. Indeed, it had the opportunity to demand the payment of all principal and interest due at the time the Building was converted to cooperative ownership, but chose not to do so. Tr. 18–19. Notwithstanding its desire to avoid application of the RSL to the Building, FHLMC indisputably has acquiesced in the use of the Building as rental housing. Accordingly, application of § 26–504 of the RSL to the Building does not effect a physical taking.

Subjecting the Building to the provisions of the RSL also does not effect a regulatory taking. Regulation of private property constitutes an unconstitutional taking if it denies an owner economically viable use of the property, or if it does not substantially advance legitimate state interests. *Higgins,* 83 N.Y.2d at 173, 630 N.E.2d at 633, 608 N.Y.S.2d at 937. Because a regulation effects a per se regulatory taking only where the owner must sacrifice *all* economically beneficial uses of the property, *Lucas v. South Carolina Coastal Council,* — U.S. ——, ——, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992), it is clear that application of the statute here—which merely would subject FHLMC to, *inter alia,* restrictions on rent and mandated lease renewal—does not effect a taking. As to whether or not the statute substantially advances a legitimate state interest, the court is satisfied that there is a "sufficiently close nexus" between New York's interest in protecting the former proprietary lessees from potentially unconscionable rent increases and the regulation at issue. *See Seawall Assocs. v. City of N.Y.,* 74 N.Y.2d 92, 112, 542 N.E.2d 1059, 1068, 544 N.Y.S.2d 542, 551, *cert. denied,* 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989) (evaluation of whether there is a substantial inter-

est requires consideration of whether there is a sufficiently close nexus between burdens and end advanced as justification for them).

In sum, requiring FHLMC to provide tenants of the Building with the protections and rights afforded under the RSL and the Code runs afoul of neither the Constitution nor the Second Circuit's ruling in *Diamond.*

### III. *FHLMC's Due Process Argument*

FHLMC also challenges the constitutionality of § 26–504 of the RSL on vagueness grounds. More specifically, FHLMC argues that application of the RSL to formerly exempt cooperative apartment buildings will result in a violation of the due process rights of the owners or mortgagees of the buildings because the RSL fails to give these owners or mortgagees notice that their buildings are subject to reversion to rent regulation. In addition, FHLMC maintains, the applicable provision of the Code is invalid because the Code fails to provide a formula for setting the rents of the former cooperative apartment units that it makes subject to regulation; therefore, owners of the buildings in which these units are located are unable to comply with the Code because they lack a mechanism for setting rents. According to FHLMC, these infirmities render the statute unconstitutionally vague. FHLMC further submits that these constitutional problems arise only if the court holds that the RSL applies to buildings formerly under cooperative ownership, and that the court therefore should interpret the statute to avoid the constitutional violation. *See United States ex rel. Attorney Gen. v. Delaware & Hudson Co.,* 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836 (1909) (duty of court to adopt construction of statute that will save statute from constitutional infirmity).

To show that a statute is unconstitutionally vague on its face, as FHLMC alleges here, " '[t]he complainant must prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " *United States v. Schneiderman,* 968 F.2d

1564, 1567 (2d Cir.1992) (*quoting Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982) (internal citations and quotations omitted)), *cert. denied*, —— U.S. ——, 113 S.Ct. 1283, 122 L.Ed.2d 676 (1993). "In other words, the statute must be impermissibly vague in all of its applications." *Id.* The court must consider two factors in adjudicating a challenge to a statute on vagueness grounds: first, the court must determine whether the statute is sufficiently definite that it gives a "'person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly'"; and second, the court must determine whether the statute provides standards that are sufficiently explicit to prevent arbitrary and discriminatory enforcement of the statute. *Amato v. Suffolk County*, 668 F.Supp. 151, 155 (E.D.N.Y.1987), *aff'd*, 847 F.2d 834 (1988) (*quoting Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). It also bears noting that statutes governing economic regulation are subject to less stringent vagueness tests than those governing constitutionally protected rights. *Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.*, 725 F.2d 843, 855 (2d Cir.), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984).

As evidenced by the discussion in the foregoing sections, this court does not find that the statute is vague—that is, it does not fail to provide a "person of ordinary intelligence" with notice or with sufficiently explicit standards. Rather, the language of the RSL and the Code is clear that the exemption from rent regulation applies only to buildings "not owned as a cooperative" "for so long as" the buildings maintain that status. As far as the omission from the Code of a specific mechanism for setting the initial regulated rent in a building formerly under cooperative ownership, as discussed in section I.B.3, *supra*, the Code provides adequate mechanisms for determining the proper amount of rent, and it is not rendered impermissibly vague by the absence of a provision expressly addressing the amount of initial regulated rent in circumstances like those in the present case.

## IV. *Historical Considerations*

This interpretation of the RSL also is supported by the legislative history of the rent regulation laws. As discussed briefly above, *see* section I, *supra*, laws providing for rent control originally were enacted in response to the severe housing shortage created by World War II. The federal government first enacted the Emergency Price Control Act of 1942, Jan. 30, 1942, ch. 26, Title I, § 1, 56 Stat. 23, and rent controls were continued by state legislation in 1946. *See* Emergency Housing Rent Control Law, L.1946, c. 274 (codified at N.Y.Unconsol.Laws §§ 8581–8597 (McKinney 1987)). New York City has enforced its own local rent regulations since 1962, pursuant to a City Council finding that "a serious public emergency continues to exist in the housing of a considerable number of persons within the city of New York...." *See* N.Y.City Admin.Code § 26–501. The RSL was enacted in 1969 for the "dual purposes" of "protect[ing] tenants from eviction as a result of rapidly spiraling rent increases and ... encourag[ing] future housing construction by allowing landlords reasonable rent increases so that they could profit from the operation of their properties." *Ansonia Residents Ass'n*, 75 N.Y.2d at 216, 551 N.E.2d at 76, 551 N.Y.S.2d at 875. The legislature has found it necessary repeatedly to reenact the rent laws, "thereby providing continued protection to tenants," *Braschi*, 74 N.Y.2d at 208–09; 543 N.E.2d at 52, 544 N.Y.S.2d at 787; the legislature's finding that an emergency exists last was renewed in 1991. *See* N.Y. City Admin.Code § 26–502 (effective Apr. 1, 1991).

The legislature most recently revisited the rent regulation laws with the enactment of the Rent Regulation Reform Act of 1993, L.1993, ch. 253 (the "1993 Act"). The 1993 Act provides, *inter alia*, that a unit may be decontrolled if the federally adjusted gross income of the occupants of the unit exceeds $250,000 for two consecutive calendar years and the unit rents for more than $2,000 per month, and also narrows the coverage of the rent regulations for apartments located in Nassau, Westchester and Rockland counties. Smith Aff.Ex. T.

Plaintiff's reliance on the legislature's enactment of the 1993 Act for the proposition that New York is attempting a wholesale abandonment of its rent regulatory laws is unwarranted. The select focus of this law on persons in a high income bracket has little bearing on the Building at issue in this case, whose occupants were in the lower to middle income tax bracket. Stewart Aff. ¶ 5. In addition, while the 1993 Act narrowed the extent of the coverage of the rent regulatory laws for cooperatives outside of New York City, the legislature made no attempt to change the breadth of the RSL as applied in New York City. Moreover, the 1993 Act specifically made its provisions applicable for the period from July 7, 1993 until June 15, 1997, which would seem to indicate that the legislature does not anticipate the imminent lapse of the rent regulatory laws.[15] Smith Aff.Ex. T § 17.

This court is cognizant of the fact that rent regulatory laws were not intended to achieve a status of permanence in our economy; there is little question that there is an "overall objective of a gradual 'transition from regulation to a normal market of free bargaining between landlord and tenant.'" *Braschi*, 74 N.Y.2d at 209, 543 N.E.2d at 52, 544 N.Y.S.2d at 788 (citation omitted). However, it is plain that the legislature still perceives the need to keep such laws in place. *But see* 1993 Housing Report of Senator Kemp Hannon (opining that housing emergency no longer exists). It is not for this court now to rule on the wisdom of maintaining the rent regulatory laws, or to decree that a housing emergency no longer exists in New York; such a determination is the province of the legislature.

Finally, both parties argue at length that consideration of the equities requires this court to adopt their respective interpretations of the RSL. The asserted interests at stake of both FHLMC and the former proprietary lessees of the Building are weighty. For example, FHLMC clearly has an interest in ensuring that the value of its investment is not reduced by the imposition of rent regulations on the Building, and the former proprietary lessees clearly have an interest in not being subjected to unconscionable rent increases on top of the loss of their equity investments. However, as the discussion in the foregoing sections illustrates, the plain language of the statute and the legislative history drive this court to conclude that the Building—like a "phoenix arising from the ashes"—is subject to the rent regulatory laws. Because the meaning of the statute is clear, the proper forum in which to seek its amendment—based on the asserted equities—is the New York legislature, and not a federal district court.

### CONCLUSION

For all the reasons stated above, this court concludes that upon the demise of the cooperative, the Building reverted to rent regulatory status. Accordingly, FHLMC's motion for summary judgment is denied, and DHCR's cross-motion for summary judgment is granted.

SO ORDERED.

---

**15.** According to D'Agosta, the reenactment of the laws for a four year period is "a marked departure from the established practice of extending the laws only two years at a time." D'Agosta Aff. ¶ 9.