Ciparick, J.
(dissenting). Since 1969, the New York City Council has embraced rent stabilization, "second generation *415 rent control,”[1] to ameliorate the "serious public emergency” caused by an acute rental housing shortage within New York City (Administrative Code of City of NY § 26-501). The Rent Stabilization Law (RSL) (Administrative Code § 26-501 et seq.) has consistently been repromulgated, most recently as of March 30, 1994, based on the legislative finding that this "serious public emergency” persists (Administrative Code § 26-502, as amended by Local Laws, 1994, No. 4 of City of NY § 6). Yet, rent stabilization is not intended to be a permanent, pervasive fixture in the rental housing market. To this end, amendments to the RSL have been adopted to address perceived changes in the urban rental housing market and to remedy abuses.
The enactment of the Emergency Tenant Protection Act (ETPA) in 1974 (L 1974, ch 576) and the Omnibus Housing Act of 1983 (OHA) (L 1983, ch 403) were directed at restricting the tenant’s right to sublet the stabilized unit. The OHA amended the RSL (now Administrative Code § 26-504 [a] [1] [f]; § 26-511 [c] [12]) to, inter alia, exempt units not occupied by the tenant of record as a primary residence from the protections of the RSL. The OHA was adopted in response to "speculative and profiteering practices” by tenants who capitalized on their rent-stabilized leases by subletting for a profit or warehousing units in the hope of conversion to individual ownership (L 1983, ch 403, § 1). In accord with the salutary purposes of the RSL, itself an emergency response to the public housing crisis engendered by disruptive rental practices, including landlords’ manipulation of rents and the supply of modestly priced housing, the OHA is designed to protect "public health, safety and general welfare” by regulating the conditions of rental occupancy to "prevent uncertainty, potential hardship and dislocation of tenants” (L 1983, ch 403, § 1).
Chapter 940 of the Laws of 1984 was enacted to remedy an unintended consequence of the OHA. Because landlords no longer had to offer renewal leases to tenants who did not use their stabilized units as their primary residence, the authorized subtenants of not-for-profit hospitals were not entitled to renewal leases, subjecting them to eviction. By amending the RSL to create an exception to the primary residence require *416 ment for not-for-profit hospitals that sublease units to their employees, the Legislature recognized that subtenancies created by not-for-profit hospitals were not susceptible to the vices the OHA intended to regulate and that the tenancies of not-for-profit hospitals are consistent with the purposes of the RSL and the ETPA. Indeed, the Division of Housing and Community Renewal (DHCR), the State agency charged with administering the RSL, recommended that the Governor approve chapter 940 (see, Letter of Div of Hous and Community Renewal Commr Yvonne Scruggs-Leftwich, Bill Jacket, L 1984, ch 940, at 14-15).
The majority declares chapter 940 unconstitutional, finding no causal nexus between chapter 940 and the RSL. I respectfully dissent and would declare chapter 940 constitutional. The close causal nexus between chapter 940 and the RSL is that chapter 940 implements a means of addressing the serious public emergency of housing people in New York City by continuing the protections of the RSL for particular tenancies already subject to rent stabilization. In this regard, chapter 940 does not suffer from any constitutional infirmity.
I.
Defendant-respondent Lenox Hill Hospital (Lenox Hill) has maintained rental apartments at 420 East 79th Street, New York City, approximately two blocks from its facility, to house affiliated employees since 1964. Lenox Hill instituted a housing program in the 1960’s in order to provide convenient, safe and affordable housing for affiliated employees, such as nurses, who work shifts that can begin or end at midnight. Typically, Lenox Hill would execute leases for a number of apartments as the tenant and then sublease an apartment to its employee, who would then assume subtenancy as an incidence of employment. Lenox Hill required the employee to occupy the apartment as a primary residence. Prior to passage of chapter 940 in 1984, Lenox Hill leased approximately 210 units in close proximity to its facility for occupancy by staff members.
In 1976, plaintiffs purchased 420 East 79th Street, at which time Lenox Hill rented 18 of the 112 units. Lenox Hill is presently the tenant of record for 15 apartments, all of which are subject to the RSL. Until 1991, plaintiffs regularly extended two-year renewal leases to Lenox Hill. Prior to the December 31, 1991 expiration of six of the leases, plaintiffs *417 served Lenox Hill and the subtenants of those units with notices of nonrenewal, informing them that the leases would not be renewed because chapter 940 of the Laws of 1984 is unconstitutional and unenforceable as it purports to grant the subtenants the right to renewal leases and/or continued occupancy, and that Lenox Hill does not occupy the subject apartments as a primary residence as required by the RSL (9 NYCRR 2524.2, 2524.4 [c]). This action ensued.
The legislative history of chapter 940 demonstrates that it was designed to reinstate the pre-OHA statutory criteria and enable not-for-profit hospitals, such as Lenox Hill, to continue established housing programs. To this end, the Senate sponsor cited Lenox Hill strictly as "an example” of a not-for-profit hospital within the measure’s purview (see, Senate Debates, NY Senate Bill S 9983, June 28, 1984).
Against this background, two factors are noteworthy. First, any buildings owned or operated on a not-for-profit basis by a hospital or other eleemosynary institution are exempt from regulation under the RSL (Administrative Code § 26-511 [c] [9] [c]) and the ETPA (McKinney’s Uncons Laws of NY § 8625 [a] [6] [ETPA § 5 (a) (6)]). Second, the Legislature recently narrowed the range of leases subject to rent stabilization by decontrolling units that rent at $2,000 per month and whose occupants’ Federal adjusted gross income exceeds $250,000 for two consecutive calendar years. While these factors may mark steps in the "transition from regulation to a normal market of free bargaining between landlord and tenant” (Administrative Code § 26-401 [a]), this course, if it continues, must be paved by the Legislature.
While rent stabilization conceptually represents an attempt to equalize the tenant’s bargaining power in a scarce housing market by regulating the rental terms,[2] the practical result of rent stabilization is to redistribute the landlord’s interest (see, Epstein, Rent Control and the Theory of Efficient Regulation, 54 Brook L Rev 741 [1988]; Radford, Regulatory Takings Law in the 1990’s: The Death of Rent Control?, 21 Sw U L Rev 1019 [1992]). Politically, this market redistribution is accepted in *418 the form of rent stabilization as a legitimate exercise of the State’s police power in response to rental housing crises, historically a vestige of World War II and, most recently, the consequence of market imbalances that create mass dislocations and shortages of affordable housing (see, Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925; see also, Braschi v Stahl Assocs. Co., 74 NY2d 201, 208; Block v Hirsh, 256 US 135, 156). Whether the rubric of rent stabilization is the appropriate means to address this end is a policy issue not appropriate for judicial resolution (see, Eisen v Eastman, 421 F2d 560, 567, cert denied 400 US 841; Lincoln Bldg. Assocs. v Barr, 1 NY2d 413, 415, appeal dismissed 355 US 12). It is not for this Court to question the reasonableness, propriety, wisdom or expediency of the legislative declaration that a housing emergency continues in New York City or to dismantle rent regulation on a piecemeal basis by judicial fiat where, as here, the statutory amendment is not only in harmony with the intent of the RSL and ETPA but substantially advances the State’s interest in militating the relentless rental crisis in New York City (see, Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, 854 F Supp 151; Rent Stabilization Assn, v Higgins, 83 NY2d 156, 174, cert denied — US —, 114 S Ct 2693).
II.
The Supreme Court has "consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails” (Loretta v Teleprompter Manhattan CATV Corp., 458 US 419, 440; see also, Pennell v San Jose, 485 US 1, 12, n 6; Bowles v Willingham, 321 US 503, 517-518; Loab Estates v Druhe, 300 NY 176, 179). Similarly, the Supreme Court has upheld the authority of State and local governments to engage in land use planning against constitutional challenge, recognizing that " '[government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law’ ” (Dolan v City of Tigard, 512 US —, —, 114 S Ct 2309, 2316, quoting Pennsylvania Coal Co. v Mahon, 260 US 393, 413). Nevertheless, a governmental regulation cannot trespass the Fifth Amendment’s guarantee that private prop *419 erty shall not be taken for a public use without just compensation. This guarantee was designed to bar government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole” (Armstrong v United States, 364 US 40, 49 [applicable to States via Fourteenth Amendment]; see, Chicago Burlington & Quincy R. R. Co. v Chicago, 166 US 226).
A claim that a governmental act infringed upon an owner’s Fifth Amendment rights is traditionally evaluated on an ad hoc factual basis (Penn Cent. Transp. Co. v New York City, 438 US 104, 124, reh denied 439 US 883). The economic impact of a governmental act upon an owner and the extent of interference with an owner’s investment-backed expectations are relevant considerations in this evaluation which, as the majority states, partakes of no precise formulation (majority opn, at 392, citing Dolan v City of Tigard, 512 US, at —, 114 S Ct, at 2319, supra). It is the opinion of this dissenter, as distinct from the analysis proffered by my dissenting colleague, that the application of these factors should not be parlayed into a discrete takings analysis.
As takings jurisprudence has evolved, the Supreme Court has identified certain intrusions as compensable "without case-specific inquiry into the public interest advanced in support of the restraint” (Lucas v South Carolina Coastal Council, 505 US —, 112 S Ct 2886, 2893). Regulations that compel a landowner to endure a physical invasion (Yee v Escondido, 503 US 519, 526-527), and regulations that deprive a landowner of all productive or economically beneficial use of the land (Nollan v California Coastal Commn., 483 US 825, 834) constitute these types of compensable takings. However, a governmental regulation will not be found to effect a taking if it "substantially advance[s] legitimate state interests” or does not "den[y] an owner economically viable use of his land” (Agins v Tiburon, 447 US 255, 260; Dolan v City of Tigard, 512 US, at —, 114 S Ct, at 2316-2317, supra; Seawall Assocs. v City of New York, 74 NY2d 92, 107, cert denied sub nom. Wilkerson v Seawall Assocs., 493 US 976; Rent Stabilization Assn., 83 NY2d, at 171, 173, supra). A regulation that substantially advances a State interest is constitutionally sound when there is an essential nexus between the State interest and the end result of the regulation (see, Seawall, 74 NY2d, at 107, supra). In its recent plurality opinion in Dolan v City of Tigard (512 US —, 114 S Ct 2309, supra) the Supreme Court deliberated over the level of scrutiny that governmental motivations and *420 findings should be subjected to when assessing whether such objectives are constitutionally sufficient to justify the regulation. The five-Justice majority settled on a heightened level of judicial scrutiny, identifying the measure of the nexus requirement as one of "rough proportionality” (Dolan v City of Tigard, 512 US, at —, 114 S Ct, at 2319-2320, supra).
In concluding that chapter 940 does not advance the over-all purposes of the RSL, but rather masquerades as general welfare legislation that preserves an exclusive housing enclave for Lenox Hill, the majority impinges upon the State’s prerogative to proportionally extend the scope of the RSL consistent with its declaration of emergency, and its underlying goals which are legitimate State interests deserving protection.
III.
Chapter 940 does not effect a regulatory taking and is constitutionally sound because it substantially advances the State’s interest in curbing chronic rental housing shortages.
In countenancing plaintiffs’ argument that they are unduly burdened by chapter 940, and characterizing chapter 940 as an unconstitutional taking, the majority overlooks the fact that the entire scheme of rent stabilization saddles owners of rental buildings with greater burdens than their unregulated counterparts in furtherance of the public health, safety and welfare, and excuses plaintiffs from a contractual obligation at the expense of tenants identified as deserving of statutory protection.
By its express terms, the RSL was promulgated "to prevent speculative, unwarranted and abnormal increases in rents * * * which creates a special hardship to persons * * * occupying rental housing” (Administrative Code § 26-501). The essential goal of the RSL is to protect and preserve certain designated tenancies from the vagaries of the marketplace. As chapter 940 is not limited to Lenox Hill but extends to all not-for-profit hospitals, it is anomalous to single out chapter 940 as "special interest legislation” since by its very nature rent stabilization bestows preferences on designated tenancies (see, Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358, 367, 368, n 3; see also, Letter of Hospital Assn of NY State to Governor’s Counsel, Bill Jacket, L 1984, ch 940, at 21 [recommending enactment of chapter 940]; Mailgrams from Beth Israel Hospital to Governor, Bill Jacket, L 1984, ch 940, at 35- *421 37 [requesting enactment of chapter 940 as essential to hospitals]; cf., 19th St. Assocs. v State of New York, 79 NY2d 434).
It is a recognized policy of DHCR to require landlord-owners to offer renewal leases to corporate tenants that lease stabilized apartments for their affiliated officers, directors or employees, provided the actual occupant satisfies the primary residence requirement (see, Matter of Cale Dev. Co. v Conciliation & Appeals Bd., 94 AD2d 229, 232, affd 61 NY2d 976; Matter of Sommer v New York City Conciliation & Appeals Bd., 115 Misc 2d 820, affd 93 AD2d 481, affd 61 NY2d 973; Matter of Sommer v New York City Conciliation & Appeals Bd., 116 AD2d 457, 459; see also, Koenig v Jewish Child Care Assn., 67 NY2d 955, 957). Consistent with this policy, DHCR supported enactment of chapter 940 as it constituted codification of existent administrative policy (see, Letter of DHCR Commissioner Scruggs-Leftwich, Bill Jacket, L 1984, ch 940, at 14-15), and ensured that currently protected tenancies would so remain.
Plaintiffs suffered no diminution of rights as a consequence. Chapter 940 in no way impairs the owners’ rights to collect periodic rent increases (see, 9 NYCRR 2522.5); evict unsatisfactory subtenants (see, 9 NYCRR 2524.3); or, completely alter the use of the premise (see, 9 NYCRR 2524.5; compare, Seawall, 74 NY2d, at 108, supra).
It is precisely because the units now rented by Lenox Hill have been and will continue to be subject to the RSL that chapter 940 is causally related to the goals of the statute it amended. As Supreme Court found and the Appellate Division upheld "[t]here is no question but that the apartments are in fact rented to hospital employees [and] it is ultimately residential tenants who are being protected” (Manocherian v Lenox Hill Hosp., 154 Misc 2d 982, 991, affd 196 AD2d 728). It was plaintiffs who accepted Lenox Hill as the tenant and consequently cloaked Lenox Hill with protection against the acute rental housing shortage through their participation in rent stabilization. Chapter 940 ensures Lenox Hill will continue to receive those benefits of the RSL it currently extends to its employee-subtenants, who then escape the perils of the rental market as an incidence of employment (see, Matter of Sommer v New York City Conciliation & Appeals Bd., 116 AD2d 457, 459, supra).
The majority’s assault on chapter 940’s scope is further minimized in light of the blanket exception from the provi *422 sions of the RSL and ETPA for housing accommodations owned or operated by nonprofit eleemosynary institutions (Administrative Code §26-511 [c] [9] [c]; McKinney’s Uncons Laws of NY § 8625 [a] [6] [ETPA § 5 (a) (6)]; cf., § 8625 [a] [11] [ETPA §5 (a) (11)]). That the ability of these institutions to provide adequate, affordable housing to their affiliates remains unimpaired despite the broad sweep of the RSL and ETPA is indicative of the State’s interest in protecting and preserving dwellings used to house affiliates of such institutions. The Lenox Hill employees, as subtenants, are entitled to the protections of the RSL and thus should not be penalized as a result of Lenox Hill’s inability or unwillingness to serve as a prime landlord or owner engaged in real estate development. A legitimate goal of rate regulation, such as rent stabilization, is the protection of the "consumer’s” welfare (see, Pennell v San Jose, 485 US, at 13, supra).
Therefore, it cannot be said, as a matter of law, that the goals of the RSL "to prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices tending to produce threats to the public health, safety and general welfare” (Administrative Code § 26-501) are not promoted when the effect of chapter 940 is to permit an urban not-for-profit hospital to offer its health care workers convenient, safe and affordable housing that otherwise would not be available (see, 19th St. Assocs. v State of New York, 79 NY2d 434, 443, supra). It is the declaration of unconstitutionality by the majority that will yield a result contrary to the RSL.
In wresting the subject rent stabilized apartments from Lenox Hill, the majority will cause the eviction of tenants from already protected dwelling space, who did nothing other than occupy their units as primary residences. By characterizing chapter 940 as a statute that diverts and subverts the equal treatment regime, the majority not only ignores the realities of rent stabilization in the urban center, but tips the balance in favor of the party that already has unequal bargaining power. This is exactly the oppressive behavior the RSL, as amended by chapter 940, seeks to forestall.
That the subtenant’s occupancy is contingent on employment by Lenox Hill does not contravene the intent of the RSL, contrary to the majority’s contention, as Lenox Hill’s motive for maintaining the rent-stabilized units is to house its affiliated employees, not the general population. Obviously, an *423 employee on the verge of retirement or otherwise poised to sever the employment relationship has notice of the requirement that occupancy is contingent upon employment by Lenox Hill as to allow for appropriate relocation plans. In any circumstance, the subtenant would receive a standard termination notice and be afforded all substantive and procedural due process rights as required by law, including a summary proceeding in Civil Court (see, 9 NYCRR 2524.2, 2524.3).
IV.
As this Court has recognized, rent regulation creates tenancies of indefinite duration (see, Rent Stabilization Assn., 83 NY2d, at 172-173, supra). It is, therefore, of no consequence whether the tenant is an individual with a finite life span or a corporation endowed with a perpetual existence, because the same result obtains (see, Seawall, 74 NY2d, at 112, supra; Nollan, 483 US, at 837, supra). Plaintiffs, who bear the heavy burden of demonstrating that the subject enactment is unconstitutional, fail to establish by any empirical proof that the rental rates of the Lenox Hill units are any less than those of comparable units in the building as to deprive them of the economically beneficial use of their property. Indeed, plaintiffs have and will continue to voluntarily collect rents from the Lenox Hill subtenants, as well as increases "by a sum equal to fifteen percent of the previous lease rental” (Administrative Code § 26-511 [c] [12] [h]) whenever Lenox Hill executes a renewal lease, provided plaintiffs have not received any vacancy increases or surcharges in the seven years prior to the new renewal lease. Any objection plaintiffs harbor regarding the sufficiency of the 15% vacancy figure is more appropriately addressed in a hardship petition before DHCR. There is no merit to Lenox Hill’s claim that plaintiffs are estopped from any such challenge to chapter 940.
I would reject plaintiffs’ assertion, credited by the majority, that plaintiffs have forfeited their reversionary interests in the subject units. This contention rings hollow when confronted with the fact that the use plaintiffs intended for the property has remained constant and plaintiffs have enjoyed the security of a tenant that always pays the rent (see, Bowles v Willingham, 321 US, at 517-518, supra; Penn Cent. Transp. Co. v New York City, 438 US, at 136, supra; Rector, Wardens, & Members of Vestry of St. Bartholomew’s Church v City of *424 New York, 914 F2d 348, 356). "It is the forced occupation * * * not the identities of the new tenants or the terms of the leases, which deprives the owners of their possessory interests and results in * * * takings” (Seawall, 74 NY2d, at 106, supra; see also, Atlanta Motel v United States, 379 US 241, 261). In this regard, plaintiffs’ "investment backed expectations” have been and will continue to be realized as there is no evidence that plaintiffs intend to sell or otherwise change the use of the subject apartments.
Plaintiffs have failed to demonstrate that chapter 940 effects a regulatory taking. Because chapter 940 substantially advances legitimate State interests and does not deprive plaintiffs of any economically beneficial use of their property, I conclude chapter 940 withstands constitutional scrutiny.
Accordingly, I would affirm the order of the Appellate Division.
Judges Simons, Titone, Mangano* and Crew* concur with Judge Bellacos a; Judges Levine and Ciparick dissent and vote to affirm in separate dissenting opinions; Chief Judge Kaye and Judge Smith taking no part.
Order reversed, with costs, chapter 940 of the Laws of 1984 declared unconstitutional and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein.

. The Rent Stabilization Law was adopted in 1969 as a "compromise solution” to runaway rent increases affecting some 400,000 post-1947 units previously unregulated and to allay builders’ fears that rent control would be extended to new construction (see, 8200 Realty Corp. v Lindsay, 27 NY2d 124, 136-137; Sullivan v Brevard Assocs., 66 NY2d 489-494).

. It has been suggested that the function of rent stabilization is to eliminate sharp, short-term rent fluctuations while the housing market responds to a shortage over time, not to hold rents at below market levels indefinitely, and calibrated, periodic increases provide owners incentive to increase the housing supply while avoiding dramatic swings in rents (see, Cirace, Housing Market Instability and Rent Stabilization, 54 Brook L Rev 1275, 1278-1279).

 Designated pursuant to NY Constitution, article VI, § 2.