Jennifer **GERMAN** and Wellington German, infants by their Mother and Natural Guardian Ana Maritza German, and Ana Maritza German, Individually, Plaintiffs,

and Marcus Coran and Raniqua Smith, infants by their Mother and Next Friend Denise Goffin, and Denise Goffin, Individually, and on behalf of all persons similarly situated, Intervening Plaintiffs,

v.

**FEDERAL HOME LOAN MORTGAGE CORP.**, Property Services Company, Caisi Management Company, Inc., 1710 Montgomery Realty Assoc., L.P., and Jerome Deutsch, Defendants.

No. 93 Civ. 6941 (RWS).

United States District Court, S.D. New York.

Sept. 15, 1995.

50 yards apart, the move has no impact on the     issues under discussion.

Fitzgerald & Fitzgerald, P.C., Yonkers, NY (John M. Daly, Brian J. Farrell, John E. Fitzgerald, of counsel), Bronx Legal Services by Lucy Billings, Matthew J. Chachere, New York City, for Plaintiff.

Siff Rosen, P.C., New York City (William G. Ballaine, Lori B. Wolmetz, of counsel), for Defendants Federal Home Loan Mortgage Corporation and Caisi Management Company, Inc.

Weinstein, Chayt & Chase, P.C., Brooklyn, NY (Irwin J. Weinstein, of counsel), for Defendants 1710 Montgomery Realty Assoc., Jerome Deutsch, Todd Wittenstein, Alex Wagman and Property Services Company.

Paul A. Crotty, Corporation Counsel of the City of New York, New York City (Gabriel Taussig, Steven Levi, Lisa S.J. Yee, of counsel), for Defendant City of New York.

SWEET, District Judge.

Plaintiff has moved by order to show cause for an order preventing defendant Federal Home Loan Mortgage Corporation ("Freddie Mac") from evicting proposed intervening plaintiffs, the Franklins, and for an order that would, among other relief sought, compel defendants Freddie Mac and the City to abate the lead paint currently in the Franklin home. In addition, the Franklins have moved to intervene in the class action that has been certified in this case. For the reasons set forth below, the intervention is granted, and the injunctive relief is denied in part and granted in part as modified.

### The Parties

The parties, facts and prior proceeding are fully described in earlier opinions of this Court, familiarity with which is assumed. *See German v. Federal Home Loan Mortgage Corp.*, 1994 WL 319154 (S.D.N.Y. June 28, 1994) (*German I* ); *German v. Federal Home Loan Mortgage Corp.*, 885 F.Supp. 537 (S.D.N.Y.1995) (*German II* or the "May Opinion"); *German v. Federal Home Loan Mortgage Corp.*, 896 F.Supp. 1385 (S.D.N.Y. 1995) (*German III* ). A review of those facts and prior proceedings relevant to this motion is presented below.

### The Proposed Intervenors

Proposed intervening plaintiff Cynthia Franklin ("Cynthia") was born on December 12, 1991, and has resided at 117 North Burgher Avenue, Staten Island, New York (the "North Burgher Avenue Building") since June 1992. She was diagnosed with an elevated blood lead level of 16 ug/dl on December 12, 1992. On March 24, 1994, her blood lead level was 35 ug/dl.

Proposed intervening plaintiff Sharia Franklin ("Sharia") was born on May 14, 1989, and has resided at the North Burgher Avenue building since June 1992. Sharia was diagnosed with an elevated blood lead levels of 18 ug/dl on September 22, 1992 and of 35 ug/dl on April 5, 1994.

Proposed intervening plaintiff Carol Franklin is the mother and natural guardian of plaintiffs Cynthia and Sharia. She has lived at the North Burgher Avenue building since June 1992 and brings this suit on behalf of herself and her above named children. Carol Franklin lives at North Burgher Avenue with her husband and six children, including the two intervening child-plaintiffs.

### The Defendants

According to the Intervening Complaint, the North Burgher Avenue building is owned and operated by Freddie Mac. Freddie Mac has held the deed since February 15, 1995. According to the Intervening Complaint (the "Complaint"), Freddie Mac receives Federal Section 8 funds for the Franklins' dwellings. Caisi is the managing agent for Freddie Mac at this building. NYCHA administers the Section 8 funds to the property.

Defendant 1710 Montgomery Realty Associates, L.P. ("1710") and partners Todd Wittenstein ("Wittenstein"), Alex Wagman ("Wagman"), and Jerome Deutsch ("Deutsch") allegedly have owned the Montgomery Building from September 16, 1992, until the present. 1710 has its principal office in Valley Stream, New York. Wittenstein and Deutsch reside in the City of New York. Wagman resides in Valley Stream, New York.

The City of New York is a defendant in the class action portion of this litigation in its role as a public housing authority ("PHA") administering federal funds.

### Prior Proceedings

This case was originally transferred to federal court from the State Court in New York on October 5, 1993.

Pursuant to a Summons with Notice and Verified Complaint dated July 26, 1993, the Germans instituted an action in Supreme Court, Bronx County, against PSC, CAISI, 1710, Freddie Mac, Deutsch, Wittenstein, and Wagman. The Complaint sought damages for personal injuries to the infant Germans and sought relief for Ana German in her individual capacity as mother and natural guardian of the infant plaintiffs.

Pursuant to 28 U.S.C. § 1446(b), Freddie Mac, as an entity created by federal legislation, removed this action to this Court on October 5, 1993.

Argument was heard on a motion to amend the Complaint on May 11, 1994. An opinion on that motion was issued on June 28, 1994, granting the plaintiffs' right to amend their complaint to include additional defendants and to supplement their claims. *See German v. Federal Home Mortgage Corporation,* 1994 WL 319154 (S.D.N.Y.).

On August 17, 1994, this Court denied the Goffin plaintiffs' request for an order blocking the sale of the building, (Proceedings, Aug. 17, 1994, at 20), and on August 22, 1994 the Goffins filed an intervening complaint in this action which sought individual and class relief.

A Second Amended Complaint (the "Complaint") was filed on September 14, 1994 in which the plaintiffs sought class certification and an order requiring defendants to take steps necessary to protect young children living in their buildings or units to which defendants administered federal funds from lead poisoning.

On September 29, 1994 the Germans and the Goffins filed a motion seeking class certification. Motions to dismiss and for partial summary judgment were also filed by all the defendants in September.

On May 8, 1995 an opinion was filed which granted in a modified form plaintiffs' motion to certify a class, granted defendants' motions to dismiss state claims based on theories of negligence *per se,* strict product liability, and liability for ultrahazardous substances. Defendants' motions to dismiss the other state causes of action were denied.

The plaintiffs requested certification for the following class and subclasses:

Class Warning and Notice

All persons residing on premises either owned, managed, or operated by any of the defendants or where they administer assistance payments under a federal housing program.

*Sub–Class # 1: Medical Monitoring*

All persons age 8 years and under and all women of child-bearing age (12–50 years old) residing in buildings owned, managed, or operated by defendants or where they administer assistance payments under a federal housing program.

*Sub–Class # 2: Abatement*

All persons age 8 years and under and all women of child-bearing age (12–50 years old) residing in buildings owned, managed, or operated by defendants or where they administer assistance payments under a federal housing program, and where there is lead-based paint in or on the dwelling or common area.

By opinion dated May 8, 1995, the court granted the class certification motion, in a somewhat modified form. Specifically, the Court held that:

The classes certified will include "children under seven years old residing in buildings owned, managed, or operated by defendants or where they administer assistance

payments under a federal housing program." While the Court agrees that as a practical matter, notice of the risks and signs of lead paint problems will need to be sent to all tenants to insure that those at risk of injury are notified, the class can only contain those at risk. The sub-class for Medical Monitoring will include the modification that there must be the risk of lead-based paint, consistent with the statutes, including the statutory presumptions." The remainder of the class definitions requested by plaintiffs will remain as requested by plaintiffs and as described herein.

*German II,* at 561.

In the final analysis, the class was certified as against the City as a PHA under the claims brought by the German plaintiffs and Freddie Mac as an owner and NYCHA as the PHA under the claims brought by the Goffin plaintiffs.

On August 22, 1995, the David family's motion to intervene was granted. *German III* at *4.

The motion to intervene the Franklin family as plaintiffs was filed on June 27, 1995, argument was heard on August 2 and the motion was considered fully submitted on August 4, 1995 when the last submission was filed with the Court. The motion for preliminary injunction was presented to the Court on August 2, 1995. The Court set the date of August 23 for a hearing on the motion. Argument was heard on the 23rd, and the motion was considered fully submitted at that time.

At the argument, the Court granted plaintiffs' request for a temporary restraint enjoining Freddie Mac from going forward with the eviction proceeding for 10 days. By letter dated August 25 from Freddie Mac to the Court, Freddie Mac represents that it is complying with that order. By letter dated August 30, Freddie Mac has agreed to relocate the Franklins temporarily and to correct and remove the lead paint conditions in the North Burgher Avenue apartment and to make the repairs required to address the lead paint violations cited by the Health Department as soon as possible. Plaintiffs submitted supplemental argument by letter dated September 1, 1995. The motion for preliminary injunction was considered fully submitted at that time.[1]

*Facts*

When the Franklins moved to North Burgher Avenue in June 1992, the building was owned by the Nesbitts. The Franklins and the Nesbitts entered into a Section 8, "Landlord–Tenant Lease Agreement," on June 18, 1992. That lease was to be effective from July 1, 1992 until February 28, 1995. The lease contained a "Subordination to Mortgages" clause:

> This lease shall be subject and subordinate at all times to the lien of existing mortgages and of mortgages which hereafter may be made a lien on the premises …

Landlord–Tenant Lease Agreement, ¶ 24.

The lease also contained a "Successors" clause:

> This lease shall be binding upon the Landlord and upon his successors, heirs, executors and administrators.

The Franklins' rent was paid directly to the Nesbitts, in part by NYCHA, pursuant to a Housing Assistants Payment[2] ("HAP") Contract with the Nesbitts, and in part by the State Department of Social Services ("DSS"). The Franklins paid no money to the landlord themselves.

On March 17, 1993, the First Federal Savings and Loan Association of Rochester ("Foreclosure plaintiffs"), initiated proceedings to foreclose on the mortgage held by the Nesbitts for the North Burgher Street property. The verified complaint listed the Nesbitts and 12 John Does as defendants. Carol Franklin, sued as John Doe # 3, was served

---

1. It is plaintiffs' contention that the voluntary commitments made by Freddie Mac's lawyer to abate the lead, allow the Franklins to return to their home and to delay proceeding with the eviction until at least September 26, do not necessarily resolve the preliminary injunction motion.

2. Under Section 8, private landlords enter into HAP contracts with the Public Housing Authority ("PHA") to receive funds on behalf of their tenants to subsidize the tenants' rent payments. 42 U.S.C. § 1437f(a)–(e).

with the complaint on April 1, 1993. Leo Franklin, sued as John Doe # 4, was served with the complaint on the same day.

Foreclosure Plaintiffs were granted summary judgment on March 14, 1994. The Franklins did not enter an appearance in the foreclosure proceeding. Carol Franklin asserts that she went to the courthouse on the day of the hearing, but was told that the proceeding was between the bank and the Nesbitts and she need not be concerned. On July 14, 1994, the Honorable John Leone of the New York Supreme Court, County of Richmond, entered a judgment of foreclosure and sale. The judgment named Carol and Leo Franklin, among other defendants. Judge Leone ordered that the property be sold at a public auction. The Court further stated that "the defendants in this action, and all persons claiming under them subsequent to the filing of the notice of the pendency of this action, be and they are forever barred and foreclosed of all rights, title, claim, lien and equity of redemption in the said mortgaged premises and in each and every part and parcel thereof."

The City of New York Department of Health ("DOH") has inspected the Franklins' apartment several times and found lead based paint.

At its inspection on June 14, 1994, DOH found 45 positive lead paint samples and ordered the owners to abate the lead paint.

In August 1994, by order to show cause, the Franklins moved in State Court for, among other relief, an injunction requiring NYCHA to "provide suitable alternate housing of the same size and in a comparable neighborhood but which has been tested for lead paint contamination and proven not to contain lead paint[.]"

By opinion dated November 3, 1994, the Honorable Louis Sangiorgio of the New York Supreme Court of the County of Richmond denied the request for this injunctive relief, holding that there is no provision in the statute or regulation promulgated thereunder requiring NYCHA to provide alternate housing for Section 8 recipients.

According to the Referee's Report of Sale, the property was sold on January 26, 1995 and that subsequent to the sale the Foreclosure Plaintiff assigned its bid to Freddie Mac. Caisi, the managing agent for Freddie Mac at the North Burgher Avenue property, gave the Franklins a letter dated February 1, 1995 addressed to "Dear Tenant," which stated, in relevant part:

Freddie Mac now owns your property as a result of a recent foreclosure sale. As a representative for Freddie Mac on this property, CAISI Management Co., Inc. want to inform you of some of your rights and options. Freddie Mac is committed to provide you with clean, decent housing and, as their representative, we will do all that we can to see that your needs as a tenant are met. . . .

2. **YOU MAY HAVE THE OPTION TO REMAIN IN THE PROPERTY AS A TENANT.** You will, of course, be required to:

* Pay rent and sign a written tenancy agreement. The rent you will be asked to pay will be set pursuant to the procedures of the Rent Equity Board. The lease agreement you will be asked to sign is a standard form lease which will describe the terms of your occupancy . . .

This letter is intended for tenants of this building only. The former owner is expected to vacate the premises immediately. (This paragraph is in a box at the end of the second and final page of the letter).

The deed for the property was transferred to Freddie Mac on February 15, 1995.

Carol Franklin asserted that she notified NYCHA and the DSS worker that the owners of her building had changed. Franklin represents that she and her family have been looking for a new apartment for quite some time and that they have had extensive contact, approximately twice weekly, with a CAISI employee named "Vianie" who is trying to help them relocate.

The Franklins' motions to intervene was served on June 27, 1995. Freddie Mac served a notice to quit on the Franklins on July 24, 1995. The notice was dated July 12, 1995.

According to Freddie Mac, it never signed a new lease with the Franklins, never received Section 8 payments for the North Burgher Avenue property, and never entered into a HAP contract with NYCHA for the property.

## Discussion

### I. *The Motion For A Preliminary Injunction As Modified, Is Denied*

The Franklins' motion for preliminary injunction seeks the following relief: (1) enjoining Freddie Mac from evicting the Franklins pending resolution of the Class Action or the relocation of the Franklins to some other suitable dwelling unit [3]; (2) requiring Freddie Mac, Caisi, NYCHA, and the City to relocate Plaintiffs within 48 hours to some other suitable dwelling unit pending abatement of the lead paint in their apartment; (3) requiring Freddie Mac, Caisi, NYCHA, and the City to begin work abating the lead paint in the Franklins' apartment within five calendar days, and to continue such abatement work until the lead paint therein is abated, and to report such completion to the Court; (4) upon completion of the abatement work, requiring Freddie Mac, Caisi, NYCHA and the City to relocate the Franklins back to their Apartment and to reinstate the Section 8 lease.

### Abatement

There is no dispute that the Franklins are living in a home which requires immediate abatement of lead paint hazards and that for all the reasons discussed in *German II*, and sources cited therein, irreparable harm from continued exposure of young children to lead paint is likely. The City of New York represented at the hearing on August 23, 1995 that either the owner, Freddie Mac, or the City would have to abate the lead condition [4]. Regardless of the outcome of an eviction proceeding, which is likely to take some time,

the lead paint hazard must be abated. Freddie Mac has indicated by letter dated August 30, 1995 that it will abate the conditions beginning as quickly as possible, perhaps before September 3, 1995. Consistent with their representation in the August 30 letter, a schedule for the abatement shall be presented to the Court within seven days which provides for the prompt abatement of the lead paint.

Freddie Mac has indicated that it will temporarily relocate the Franklins while the repairs are made and that they shall be returned to their home as soon as repairs are completed. This shall also be done. Freddie Mac having agreed to comply with the Plaintiffs' request in terms of abatement, the Court will at this time address only the relief sought with regard to the eviction proceeding.

### 1. *Standards For Preliminary Injunction*

■ The standard for granting a preliminary injunction in this Circuit is a showing of (1) the likelihood of irreparable injury and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in favor of the movant. *Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 966–67 (2d Cir.1995); *see Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994); *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 135–36 (2d Cir.1992); *S.E.C. v. Unifund SAL,* 910 F.2d 1028, 1038 n. 7 (2d Cir.1990); *Citibank, N.A. v. Nyland (CF8) Ltd.,* 839 F.2d 93, 97 (2d Cir.1988).

■ The Second Circuit considers the showing of irreparable harm to be "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction."

---

**3.** The original request had additional relief sought pending the disposition of the motion to intervene. Since the motion to intervene is granted, as discussed below, only that relief still requested under the circumstances is described.

**4.** The Court does not have jurisdiction in this litigation over the City in its capacity as the Department of Health or Housing and Preservation Department to order abatement. Consistent

with *German II*, the City is a defendant in its capacity as a public housing authority administering CDBG funds, and as a past owner of housing in the case of the Germans. Consistent with *German III*, the City is a defendant as an owner of the Boston Road Building. It is in neither of these capacities that the City represented that it would do the abatement in the event that Freddie Mac refused.

*Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42, 45 (2d Cir.1983)). Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation, a preliminary injunction should not be issued. *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990). A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation. *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 974 (2d Cir.1989).

■ The law in this Circuit requires a showing that irreparable damages are likely, not merely possible. *JSG Trading Corp.,* 917 F.2d at 79; *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Thus, the standard that a movant must meet is extremely high. *Harrison/Erickson, Inc. v. Chicago Bulls Ltd. Partnership,* 1991 WL 51118, at *7 (S.D.N.Y.1991).

### Eviction

The Court has been presented with no authority on this motion for enjoining Freddie Mac from proceeding in state court with its eviction proceeding after September 26, the date · before which Freddie Mac has agreed not to proceed. The eviction proceeding should take place in state court. The question for this court is whether Freddie Mac must meet the notice provision and cause standards imposed by Section 8 or whether Freddie Mac may proceed in the absence of any constraints imposed by Section 8.

■ In general, when a tenant's lease is subordinate to a mortgage and the title to the property is transferred pursuant to a foreclosure proceeding that names the tenants as defendants, and the property is sold, with proper notice given, the tenants lose their rights to continued tenancy. *See United Security Corp. v. Suchman,* 307 N.Y. 48, 52–54, 119 N.E.2d 881 (1954); *Lincoln First Bank, N.A. v. Polishuk,* 86 A.D.2d 652, 652, 446 N.Y.S.2d 399 (2d Dep't. 1982). The lease between the Franklins and the Nesbitts, the standard Section 8 lease, contained a subor-

dination clause. The Franklins were named defendants in the relevant state court proceedings and thus they have no continued rights as tenants under New York law. *See Id.*

Exceptions to the non-rights of such tenants are provided to tenants living in rent control units in New York City by local law. *See* New York City Administrative Code § 26–408; *Da Costa v. Hamilton Republican Club,* 187 Misc. 865, 65 N.Y.S.2d 500, 503 (N.Y.Co.1946), *Pisani v. Cominger,* 36 A.D.2d 593, 318 N.Y.S.2d 913 (1st Dept 1971); *De Santis v. White Rose Associates,* 152 Misc.2d 567, 578 N.Y.S.2d 363, 366 (N.Y.Co.1991). Section 26–408 reads, in pertinent part that:

> No tenant, as long as he or she continues to pay the rent to which the landlord is entitled, shall be removed from any housing accommodation which is subject to rent control under this chapter by action to evict ... notwithstanding the fact that the tenant has no lease or that his or her lease ... has expired or otherwise terminated ...

New York City Administrative Code, § 26–408(a).

While the rent control laws in New York and Section 8 were both developed, in part, to address the lack of decent, affordable housing for low income persons, the Court has been provided with no authority for the proposition that New York law protects the continued housing interests of tenants in federally subsidized housing, such as Section 8, in these circumstances. While it would be consistent with the protections offered to rent control tenants, it is not clear that such protection exist under New York law.

■ Plaintiffs offer that Section 8 itself provides special protection for tenants that remain in units after new owners have secured the property pursuant to a foreclosure sale. No direct authority for this proposition has been provided. Plaintiffs have cited several cases that stand for the proposition that a lease between a Section 8 tenant and a landlord is no longer for a fixed period of time, but instead that it is "automatically renewed upon the expiration date." *Maia v.*

*Castro,* 139 Misc.2d 312, 527 N.Y.S.2d 154, 156 (Dist.Ct. Nassau Co.1988); *see Mitchell v. U.S. Dept. of Housing and Urban Development,* 569 F.Supp. 701, 706–708 (N.D.Cal. 1983). This finding is based squarely on provisions of the regulations and the language of the lease. In addition, landlords cannot terminate Section 8 leases except for cause as spelled out in 24 C.F.R. 882.215(c), of the regulations implementing Section 8. In relevant part, Section 882.215 reads:

(a) Term of Lease.

(1) The term of the Lease shall begin on a date stated in the Lease, and shall continue until:

(i) A termination of the Lease by the Owner in accordance with paragraph (c) of this section,

(ii) A termination of the Lease by the Family in accordance with the Lease or by mutual agreement during the term of the Lease, or

(iii) A termination of the Contract by the PHA.

(2) The term of the Lease shall begin at least one year prior to the end of the remaining term of the ACC. The Contract and the Lease shall end upon termination of the ACC.

(3) During the term of the Lease, the Contract Rent shall be subject to adjustment in accordance with § 882.108, and the Tenant Rent shall be subject to change in accordance with HUD regulations and requirements.

(4) The Owner may offer the Family a new Lease for execution by the Family after approval by the PHA in accordance with s 882.209(k), for a term beginning at any time after the first year of the term of the Lease. The Owner shall give the tenant written notice of the offer, with copy to the PHA, at least sixty days before the proposed commencement date of the new Lease term. The offer may specify a reasonable time limit for acceptance by the Family.

(5) The Lease shall permit a termination of the Lease by the Family without cause, at any time after the first year of the term of the Lease, on not more than sixty days written notice by the Family to the Owner [with copy to the PHA].

(b) Housing Assistance Payments Contract.

(1) The Contract for a unit shall be in a form prescribed by HUD.

(2) The term of the Contract shall begin on the first day of the term of the Lease and shall end on the last day of the term of the Lease.

(c) Termination of Tenancy (for Leases entered into on or after October 1, 1981).

(1) The Owner shall not terminate the tenancy except for:

(i) Serious or repeated violation of the terms and conditions of the Lease;

(ii) Violation of Federal, State, or local law which imposes obligations on the tenant in connection with the occupancy or use of the dwelling unit and surrounding premises; or

(iii) Other good cause.

(2) The following are some examples of "other good cause" for termination of tenancy by the Owner: Failure by the Family to accept the offer of a new Lease in accordance with paragraph (a)(4) of this section; a Family history of disturbance of neighbors or destruction of property, or of living or housekeeping habits resulting in damage to the unit or property; criminal activity by Family members involving crimes of physical violence to persons or property; the Owner's desire to utilize the unit for personal or family use or for a purpose other than use as a residential rental unit; or a business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, desire to rent the unit at a higher rental). This list of examples is intended as a non-exclusive statement of some situations included in "other good cause," but shall in no way be construed as a limitation on the application of "other good cause" to situations not included in the list.

.    .    .    .    .

(4) The Owner may evict the tenant from the unit only by instituting a court

action. The Owner must notify the PHA in writing of the commencement of procedures for termination of tenancy, at the same time that the Owner gives notice to the tenant under State or local law. The notice to the PHA may be given by furnishing to the PHA a copy of the notice to the tenant.

.         .         .         .         .

(e) Concurrent Notices. Any notices required under this section (see paragraphs (a)(4), (a)(5), (c)(3) and (d) of this section) may be combined with and run concurrently with any notices required under State or local law.

.         .         .         .         .

(g) Applicability. Paragraphs 882.-215(a), (b), (c)(2) and (c)(3) shall be applicable if a Lease or Contract is entered after May 10, 1984.

24 CFR § 882.215.

According to these regulations, the HAP contract is coextensive with the term of the lease, and the lease is continuous until proper notice is given by the Family or the Owner terminates the lease consistent with the provisions of 882.215(c).

The Franklin situation presents the question of the terms of an available eviction proceeding for a homeowner who never entered into an initial lease, but "inherited" Section 8 tenants through an allegedly proper foreclosure proceeding and sale.

In dicta in *O'Brien v. Town of Westerly Housing Authority*, 626 F.Supp. 1065, 1067 n. 2 (D.R.I.1986), the Honorable Raymond J. Pettine noted that "[t]his policy (of suspending housing assistance payments) is designed to protect Section 8 tenants since without the HAP contract assignment the new landlord is not bound by the Section 8 regulations." *O'Brien* recognizes the property interest in a Section 8 tenancy, while indicating that there is not an automatic assumption of the contract with the Housing Authority by the new owner. There was, however, no analysis of this conclusion which relates to the HAP contract and does not address the continuing obligations under the lease.

The lease, in fact, contains conflicting clauses with respect to the obligations of new owners. The "Successors" clause in the lease, which is incorporated into the "Landlord's Obligations" section, states that "the lease shall be binding upon the Landlord and upon his successors, heirs, executors and administrators" is consistent with a continued obligation on successive owners of the property. The Subordination clause, which is also included in the "Landlord's Obligations" portion, is arguably inconsistent with a special right under Section 8 of continued habitation for Section 8 tenants after a foreclosure and sale under applicable state law.

The strong protections, at least procedural, given to tenants in the program to maintain their leases unless there is cause to terminate, could be translated into a right to remain in the unit absent a properly noticed showing of good cause to terminate. Courts in New York have appropriately noted that "the entire program is structured for the benefit of the Section 8 tenant." *Lamlon Development Corp. v. Owens*, 141 Misc.2d 287, 533 N.Y.S.2d 186, 190 (Nassau County 1988). Because of the understandable confusion that the conflicting lease provisions present for tenants and because it is appropriate to read these provisions to protect the housing rights of Section 8 tenants, the successor owners in this particular situation are bound to the terms of the Section 8 lease.

Here, where it appears that Carol Franklin was told that the foreclosure procedure did not concern her, where Freddie Mac initially treated the Franklins as tenants by sending them a "Dear Tenants" letter and would, consistent with the Freddie Mac policy of maintaining paying cooperative tenants, have kept them as tenants, it is appropriate to require that Freddie Mac be required to meet the notice and cause requirements embodied in the Section 8 lease, consistent with the expectations the Franklins had under their Section 8 tenancy.

Since successors are bound to the lease and that Section 8 requirements with respect to eviction must be met, Freddie Mac will not be enjoined from proceeding in state court, although they must provide appropriate notice consistent with Section 8. The Regulations governing Section 8 state that an owner may evict a tenant from a unit "only by

instituting a court action. The Owner must notify the PHA in writing of the commencement of procedures for termination of tenancy, at the same time that the Owner gives notice to the tenant under State or local law." 24 C.F.R. § 882.215. Freddie Mac has the right to pursue that action in state court. Additionally, the HUD regulations envisioned that termination issues would be resolved in a state court eviction action. *See* 49 Fed. Reg. 12,235 (1984) (HUD commentary noting that "[t]he questions involved in a termination of tenancy are best resolved in the state judicial proceedings for eviction of a tenant"). Issues of improper notice, good cause and special protections under state law may be raised in the state proceeding, but do not compel the granting of this injunction.

Finally, Plaintiffs assert that the timing of the eviction proceedings are suspicious and retaliatory. The Franklins received notice as tenants shortly after Freddie Mac assumed ownership of the property. That notice included a provision that current tenants might be able to stay if they met certain conditions. There is nothing on the record to indicate that the Franklins did not meet those conditions or that there was any problem having them as tenants. It is true that they did not pay rent to Freddie Mac, but since their rent to date had been paid directly by NYCHA and DSS, and since they notified CAISI that the agencies needed additional verification to initiate payment to Freddie Mac, the lack of payments cannot fairly be attributed to the Franklins.

■ Plaintiffs assert that in initiating eviction proceedings less than a month after the Franklins sought intervention in this lawsuit, Freddie Mac has acted in violation of New York Real Property Law ("RPL") § 223–b(1), which provides, in relevant part, that:

No landlord ... shall serve a notice to quit upon any tenant or commence any action to quit upon any tenant or action to recover real property or summary proceeding to recover possession of real property in retaliation for:

    a. A good faith complaint was made, by or on behalf of the tenant, to a governmental authority of the landlord's al-

leged violation of any health or safety law, regulation, code or ordinance or any law of regulation which has as its objective the regulation of premises used for dwelling purposes, ... or

    b. Actions taken in good faith by or on behalf of the tenant, to secure or enforce any rights under the lease or under any law of the State of New York, or its governmental subdivisions, or of the United States which has as its objective the regulation of premises used for dwelling purposes.

RPL § 223–b(5) creates a rebuttable presumption that the landlord is acting in retaliation if the tenant establishes that the landlord served a notice to quit within six months after:

    a. A good faith complaint was made, by or on behalf of the tenant, to a governmental authority of the landlord's alleged violation of any health or safety law, regulation, code or ordinance or any law of regulation which has as its objective the regulation of premises used for dwelling purposes; ... or

    b. The tenant has in good faith commenced an action or proceeding in Court ... to secure or enforce against the landlord or his agents any rights under the lease, ... or under any law of the State of New York, or its governmental subdivisions, or of the United States which has as its objective the regulation of premises used for dwelling purposes.

Prior to the passage of § 223–b, in *Hosey v. Club Van Cortlandt,* 299 F.Supp. 501, 505–506 (S.D.N.Y.1969), this Court considered enjoining a state eviction proceeding in circumstances similar to this one and concluded that if New York had a rule which prohibited a defendant in an eviction proceeding from raising a "retaliatory eviction" defense, it would likely have enjoined the proceeding. Then, as now, New York does not prevent defendants in eviction proceedings from raising retaliatory eviction as a defense. In fact, the right to assert a retaliatory defense has been codified in § 223–b and exists outside of New York statutory law. *See* Real Property Law, § 223–b (McKinneys 1995 Supplement);

*Kew Gardens Associates v. Regan,* 106 Misc.2d 267, 431 N.Y.S.2d 260, 261 (Queens Co.1980); *Markese v. Cooper,* 70 Misc.2d 478, 333 N.Y.S.2d 63, 66 (Monroe Co.1972).

While it is not for this Court to decide the merits of the defense, the Franklins have a basis for asserting retaliation and may raise the defense in the state eviction proceeding. *See* Real Property Law, § 223–b (McKinneys 1995 Supplement); *see also McKay v. Smith,* 110 Misc.2d 518, 442 N.Y.S.2d 756, 758–59 (Nassau Co.Dist.Ct.1981).

The portion of the motion seeking to enjoin Freddie Mac from pursuing eviction in a state court proceeding will be denied. In this case, however, any attempt to evict must comply with the termination of tenancy regulations described in 24 C.F.R. 882.215 and must provide the Franklins with the meaningful opportunity to be heard to which they are entitled.

## II. *The Franklins' Motion To Intervene Will Be Granted*

### A. *Legal Standard*

■ The Intervenors presently before this Court seek to intervene pursuant to Rule 24(b)(2), Fed.R.Civ.P. The Rule provides that "[u]pon timely application anyone may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common." The Rule is to be construed liberally, *see German III* at *4; *Davis v. Smith,* 431 F.Supp. 1206, 1209 (S.D.N.Y. 1977), *aff'd,* 607 F.2d 535 (2d Cir.1978), and it does not require an identity of facts, *see Swift v. Toia,* 450 F.Supp. 983, 990 (S.D.N.Y. 1978), *aff'd,* 598 F.2d 312 (2d Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 687, 62 L.Ed.2d 658 (1980).

■ Rule 24(b)(2) is satisfied when, "despite factual differences between the parties, a common question of law is involved." *Davis,* 431 F.Supp. at 1209; *see Brooks v. Flagg Brothers, Inc.,* 63 F.R.D. 409, 412–14 (S.D.N.Y.1974). Ultimately, whether to allow a party to intervene is within the discretion of the district court. *See United States Postal Service v. Brennan,* 579 F.2d 188, 191 (2d Cir.1978); *Cook v. Pan American World Airways, Inc.,* 636 F.Supp. 693, 698 (S.D.N.Y.1986).

■ Varying facts and circumstances may actually add to the Court's understanding of the scope and breadth of the claims and therefore support an intervention motion. *Rivera v. New York City Housing Authority,* 1995 WL 375912 (S.D.N.Y.1995) at *3 (citing *McNeill v. New York City Housing Authority,* 719 F.Supp. 233, 250 (S.D.N.Y.1989); *Hurley v. Van Lare,* 365 F.Supp. 186, 196 (S.D.N.Y.1973), *rev'd on other grounds and remanded,* 497 F.2d 1208 (2d Cir.1974)). Admitting intervenors who add no new issues "merely clutters the [class] action unnecessarily."

■ This litigation is still is in its early stages, so that the Intervenors' motion is timely. There is no question that the Intervenors have potential claims with questions of law or fact in common with the presently named Plaintiffs. As a family with children under seven that live in a unit owned by Freddie Mac that is eligible for receiving Section 8 funds administered by NYCHA, they are appropriate class members and will provide the Court with additional material to review as this case progresses. The additional plaintiffs will not detract from the original plaintiffs' case and will add to the Court's understanding of the facts. *German III,* at *4; *see Rivera,* 1995 WL 375912 at *3. At this point in the litigation, the addition of these parties does not prejudice the defendants. Since the litigation involves housing that often changes ownership, and may involve a relatively fluid plaintiff class, it may well assist the litigation to have additional named plaintiffs.

There is no dispute but that not all of the laws and regulations cited in the Class Complaint apply to the unit in a two-family dwelling. Intervention only requires a common question of law, which exists several times over. Many of the laws recited by plaintiffs in the class action apply equally to occupants of two-family and multi-family dwellings.

■ Finally, intervention is appropriate here where the Intervenors are represented by the same counsel as the other named plaintiffs and their participation will facilitate

adjudication of the dispute. *See Rivera, Id.; Davis v. Smith,* 431 F.Supp. 1206, 1209 (S.D.N.Y.1977).

### Conclusion

The motion for preliminary injunction with respect to proceeding with the eviction proceeding after September 26, 1995 is denied consistent with the discussion above. The parties will submit an abatement schedule to the Court within seven days which provides for the prompt abatement of the lead paint, consistent with the discussion above. Plaintiffs' motion to intervene the Franklins in this action is granted.

There will be a pretrial conference on September 20, 1995 at 4:30 p.m.

It is so ordered.