*801 OPINION OF THE COURT
Thomas P. Aliotta, J.
The respondents move for an order dismissing petitioner’s notice to quit by raising various defenses, one of which is petitioner’s failure to abide by Department of Housing and Urban Development (HUD) section 8 notice provisions (see, 42 USC § 1437f).
The court finds the facts of this matter to be as follows:
The Franklins moved to 117 North Burgher Avenue, Staten Island, New York, in June 1992. At that time the building was owned by the Nesbitts. The Franklins and the Nesbitts entered into a section 8 "Landlord-Tenant Lease Agreement” on June 18, 1992. That lease was to be effective from July 1, 1992 until February 28, 1995. That lease contained a successor’s clause: "This lease shall be binding upon the landlord and upon his successors, heirs, executors and administrators.”
The Franklins’ rent was paid directly to the Nesbitts, in part by the New York City Housing Authority pursuant to a housing assistance payment contract with the Nesbitts, and in part by the State Department of Social Services. The Franklins paid no money to the landlord themselves. On March 17, 1993 the First Federal Savings and Loan Association of Rochester initiated proceedings to foreclose on the mortgage held by the Nesbitts at 117 North Burgher Avenue. The Franklins were served with a copy of this foreclosure complaint on April 1, 1993.
First Federal Savings and Loan Association of Rochester was granted summary judgment on their foreclosure action on March 14, 1994. The Franklins did not appear in the foreclosure proceedings. Carol Franklin alleges that she went to the courthouse on the day of the hearing, but was told that the proceeding was between the bank and the Nesbitts and she need not be concerned.
On July 14, 1994, the Hon. John Leone of the New York State Supreme Court, County of Richmond, entered a judgment of foreclosure and sale which named the Franklins among other defendants. Judge Leone ordered that the property be sold at a public auction. The court further stated that "the defendants in this action, and all persons claiming under them subsequent to the filing of the Notice of Pendency of this action, be and they are forever barred and foreclosed of all rights, title, claim, mean and equity of redemption in the said mortgaged premises and in each and every part and parcel thereof.”
*802 The property was sold on January 26, 1995 and subsequent to the sale at foreclosure the First Federal Savings and Loan Association of Rochester assigned its bid to petitioner Federal Home Loan Mortgage Corporation (hereinafter referred to as Freddie Mac). Caisi Management Company, the managing agent for Freddie Mac at the North Burgher Avenue property, gave the Franklins a letter dated February 1, 1995 addressed "Dear Tenant,” which stated in relevant part:
"Freddie Mac now owns your property as a result of a recent foreclosure sale. As a representative for Freddie Mac on this property, Caisi Management Company Inc. wants to inform you of some of your rights and options.
"1. Freddie Mac is committed to provide you with clean, decent housing and, as their representative, we will do all that we can to see that your needs as a tenant are met * * *
"2. YOU MAY HAVE THE OPTION TO REMAIN IN THE PROPERTY AS A TENANT.
"You will, of course be required to: Pay rent and sign a written tenancy agreement. The rent you will [be] asked to pay will be set pursuant to the procedures of the Rent Equity Board.”
The deed for the property was transferred to Freddie Mac on February 15, 1995.
The Franklin family made a motion to intervene in the Federal class action pending in the Southern District entitled German v Federal Home Loan Mtge. Corp. (899 F Supp 1155, 1158-1159). That class was certified to include " 'children under seven years old residing in buildings owned, managed, or operated by defendants’ * * * and when there is lead-based paint in or on the dwelling or common area.” The gravamen of the Franklins’ claims is to obtain defendants’ compliance with orders to correct the lead paint violations and with any other requirements regarding hazardous conditions in their premises, to wit: the proper, safe, and full abatement of the lead paint, to reduce the children’s exposure, and to ensure and monitor their recovery from past poisonings and protection from future poisonings.
The motion to intervene the Franklin family as plaintiffs in this class action was filed on June 27, 1995. Freddie Mac served a notice to quit on the Franklins on July 24, 1995. The notice was dated July 12, 1995.
The Franklins filed a motion for preliminary injunction with the Federal court on August 2,1995. The Franklins’ motion for *803 a preliminary injunction sought to enjoin Freddie Mac from evicting the Franklins pending resolution of the class action or the relocation of the Franklins to some other suitable dwelling unit and to require the defendants to relocate plaintiffs pending abatement of the lead paint in their apartment and to abate the lead paint in the Franklins’ apartment.
Since Freddie Mac relocated the Franklins and began the lead abatement in the Franklins’ apartment without court order, that portion of the request for a preliminary injunction became moot. In the Hon. Robert Sweet’s order the court recognized that the issue it was addressing was "only the relief sought with regard to the eviction proceedings.” (899 F Supp, at 1161, supra.) Judge Sweet held that the eviction proceedings should take place in State court.
He further held that "the question for this court is whether Freddie Mac must meet the notice provision and cause standards imposed by section 8 or whether Freddie Mac may proceed in the absence of any constraints imposed by Section 8”. (Supra, at 1162.)
Judge Sweet goes on to analyze this issue of law in his order (supra, at 1162-1166) as follows:
"In general, when a tenant’s lease is subordinate to a mortgage and the title to the property is transferred pursuant to a foreclosure proceeding that names the tenants as defendants, and the property is sold, with proper notice given, the tenants lose their rights to continued tenancy. See United Security Corp. v. Suchman, 307 N.Y. 48, 52-54, 119 N.E.2d 881 (1954); Lincoln First Bank, N.A. v. Polishuck, 86 A.D.2d 652, 652, 446 N.Y.S.2d 399 (2d Dep’t. 1982). The lease between the Franklins and the Nesbitts, the standard Section 8 lease, contained a subordination clause. The Franklins were named defendants in the relevant state court proceedings and thus they have no continued rights as tenants under New York law. See Id.
"Exceptions to the non-rights of such tenants are provided to tenants living in rent control units in New York City by local law. See New York City Administrative Code § 26-408; Da Costa v. Hamilton Republican Club, 187 Misc. 865, 65 N.Y.S.2d 500, 503 (N.Y.Co.1946), Pisani v. Cominger, 36 A.D.2d 593, 318 N.Y.S.2d 913 (1st Dept 1971); De Santis v. White Rose Associates, 152 Misc.2d 567, 578 N.Y.S.2d 363, 366 (N.Y.Co.1991). Section 26-408 reads, in pertinent part that:
" 'No tenant, as long as he or she continues to pay the rent to which the landlord is entitled, shall be removed from any *804 housing accommodation which is subject to rent control under this chapter by action to evict... notwithstanding the fact that the tenant has no lease or that his or her lease... has expired or otherwise terminated...’
"New York City Administrative Code, § 26-408(a).
"While the rent control laws in New York and Section 8 were both developed, in part, to address the lack of decent, affordable housing for low income persons, the Court has been provided with no authority for the proposition that New York law protects the continued housing interests of tenants in federally subsidized housing, such as Section 8, in these circumstances. While it would be consistent with the protections offered to rent control tenants, it is not clear that such protection exist under New York law.
"Plaintiffs offer that Section 8 itself provides special protection for tenants that remain in units after new owners have secured the property pursuant to a foreclosure sale. No direct authority for this proposition has been provided. Plaintiffs have cited several cases that stand for the proposition that a lease between a Section 8 tenant and a landlord is no longer for a fixed period of time, but instead that it is 'automatically renewed upon the expiration date.’ Maia v. Castro, 139 Misc.2d 312, 527 N.Y.S.2d 154, 156 (Dist.Ct. Nassau Co.1988); see Mitchell v. U.S. Dept. of Housing and Urban Development, 569 F.Supp. 701, 706-708 (N.D.Cal.1983). This finding is based squarely on provisions of the regulations and the language of the lease. In addition, landlords cannot terminate Section 8 leases except for cause as spelled out in 24 C.F.R. 882.215(c), of the regulations implementing Section 8. In relevant part, Section 882.215 reads:
"(a) Term of Lease.
"(1) The term of the Lease shall begin on a date stated in the Lease, and shall continue until:
"(i) A termination of the Lease by the Owner in accordance with paragraph (c) of this section,
"(ii) A termination of the Lease by the Family in accordance with the Lease or by mutual agreement during the term of the Lease, or
"(iii) A termination of the Contract by the PHA * * *
"(c) Termination of Tenancy (for Leases entered into on or after October 1, 1981) * * *
"(i) Serious or repeated violation of the terms and conditions of the Lease;
*805 "(ii) Violation of Federal, State, or local law which imposes obligations on the tenant in connection with the occupancy or use of the dwelling unit and surrounding premises; or
"(iii) Other good cause * * *
"(4) The Owner may evict the tenant from the unit only by instituting a court action. The Owner must notify the PHA in writing of the commencement of procedures for termination of tenancy, at the same time that the Owner gives notice to the tenant under State or local law. The notice to the PHA may be given by furnishing to the PHA a copy of the notice to the tenant * * *
"(e) Concurrent Notices. Any notices required under this section (see paragraphs (a)(4), (a)(5), (c)(3) and (d) of this section) may be combined with and run concurrently with any notices required under State or local law * * *
"(g) Applicability. Paragraphs 882.215(a), (b), (c)(2) and (c)(3) shall be applicable if a Lease or Contract is entered after May 10, 1984.
"24 CFR § 882.215.
"According to these regulations, the HAP contract is coextensive with the term of the lease, and the lease is continuous until proper notice is given by the Family or the Owner terminates the lease consistent with the provisions of 882.215(c).
"The Franklin situation presents the question of the terms of an available eviction proceeding for a homeowner who never entered into an initial lease, but 'inherited’ Section 8 tenants through an allegedly proper foreclosure proceeding and sale.
"In dicta in O’Brien v. Town of Westerly Housing Authority, 626 F.Supp. 1065, 1067 n.2 (D.R.I.1986), the Honorable Raymond J. Pettine noted that '[t]his policy (of suspending housing assistance payments) is designed to protect Section 8 tenants since without the HAP contract assignment the new landlord is not bound by the Section 8 regulations.’ O’Brien recognizes the property interest in a Section 8 tenancy, while indicating that there is not an automatic assumption of the contract with the Housing Authority by the new owner. There was, however, no analysis of this conclusion which relates to the HAP contract and does not address the continuing obligations under the lease.
"The lease, in fact, contains conflicting clauses with respect to the obligations of new owners. The 'Successors’ clause in the lease, which is incorporated into the 'Landlord’s Obligations’ *806 section, states that 'the lease shall be binding upon the Landlord and upon his successors, heirs, executors and administrators’ is consistent with a continued obligation on successive owners of the property. The Subordination clause, which is also included in the 'Landlord’s Obligations’ portion, is arguably inconsistent with a special right under Section 8 of continued habitation for Section 8 tenants after a foreclosure and sale under applicable state law.
"The strong protections, at least procedural, given to tenants in the program to maintain their leases unless there is cause to terminate, could be translated into a right to remain in the unit absent a properly noticed showing of good cause to terminate. Courts in New York have appropriately noted that 'the entire program is structured for the benefit of the Section 8 tenant.’ Lamlon Development Corp. v. Owens, 141 Misc.2d 287, 533 N.Y.S.2d 186, 190 (Nassau County 1988). Because of the understandable confusion that the conflicting lease provisions present for tenants and because it is appropriate to read these provisions to protect the housing rights of Section 8 tenants, the successor owners in this particular situation are bound to the terms of the Section 8 lease.
"Here, where it appears that Carol Franklin was told that the foreclosure procedure did not concern her, where Freddie Mac initially treated the Franklins as tenants by sending them a 'Dear Tenants’ letter and would, consistent with the Freddie Mac policy of maintaining paying cooperative tenants, have kept them as tenants, it is appropriate to require that Freddie Mac be required to meet the notice and cause requirements embodied in the Section 8 lease, consistent with the expectations the Franklins had under their Section 8 tenancy.
"Since successors are bound to the lease and that Section 8 requirements with respect to eviction must be met, Freddie Mac will not be enjoined from proceeding in state court, although they must provide appropriate notice consistent with Section 8. The Regulations governing Section 8 state that an owner may evict a tenant from a unit 'only by instituting a court action. The Owner must notify the PHA in writing of the commencement of procedures for termination of tenancy, at the same time that the Owner gives notice to the tenant under State or local law.’ 24 C.F.R. § 882.215. Freddie Mac has the right to pursue that action in state court. Additionally, the HUD regulations envisioned that termination issues would be resolved in a state court eviction action. See 49 Fed. Reg. 12,235 (1984) (HUD commentary noting that '[t]he questions involved *807 in a termination of tenancy are best resolved in the state judicial proceedings for eviction of a tenant’). Issues of improper notice, good cause and special protections under state law may be raised in the state proceeding, but do not compel the granting of this injunction * * *
"The portion of the motion seeking to enjoin Freddie Mac from pursuing eviction in a state court proceeding will be denied. In this case, however, any attempt to evict must comply with the termination of tenancy regulations described in 24 C.F.R. 882.215 and must provide the Franklins with the meaningful opportunity to be heard to which they are entitled.”
The respondent now moves to have the notice to quit dismissed for petitioner’s failure to follow the requisite notice provisions in 24 CFR 882.215. The issue of law concerning whether a HUD section 8 tenancy terminates and/or a tenant is entitled to notice as per 24 CFR 882.215 was decided by Judge Sweet in the matter of German v Federal Home Loan Mtge. Corp. (899 F Supp 1155, supra) and the petitioner is collaterally estopped from raising this issue again.
The related doctrines of res judicata and collateral estoppel were succinctly explained by the Court of Appeals in 1979 as follows: "Collateral estoppel, together with its related principles, merger and bar, is but a component of the broader doctrine of res judicata which holds that, as to the parties in a litigation and those in privity with them, a judgment on the merits by a court of competent jurisdiction is conclusive of the issues of fact and questions of law necessarily decided therein in any subsequent action * * * This principle, so necessary to conserve judicial resources by discouraging redundant litigation, is grounded on the premise that once a person has been afforded a full and fair opportunity to litigate a particular issue, that person may not be permitted to do so again * * * Collateral estoppel is to a corollary to the doctrine of res judicata; it permits in certain situations the determination of an issue of fact or law raised in a subsequent action by reference to a previous judgment on a different cause of action in which the same issue was necessarily raised and decided” (Gramatan Home Investors Corp. v Lopez, 46 NY2d 481, 485 [1979] [citations omitted]).
The various policy purposes underlying those doctrines were summarized in Southwest Airlines Co. v Texas Intl. Airlines (546 F2d 84, 94 [5th Cir], cert denied 434 US 832 [1977]): "The principle of res judicata serves several policies important to our judicial system. By declaring an end to litigation, the doc *808 trine adds certainty and stability to social institutions. This certainly in turn generates public respect for the courts. By preventing relitigation of issues, res judicata conserves judicial time and resources. It also supports several private interests, including avoidance of substantial litigation expenses, protection from harassment or coercion by lawsuit, and avoidance of conflicting rights and duties from inconsistent judgments” (footnotes omitted).
"In its broadest sense, the doctrine of res judicata is based on the interests of practicality and finality — that is, that limits ought to be imposed on litigation, and that once a cause has been fairly tried, a second suit for relief based on the same facts ought to be foreclosed” (Weiner v Greyhound Bus Lines, 55 AD2d 189, 191 [2d Dept 1976]). Courts, referring to the doctrines of collateral estoppel and res judicata, have instructed that " 'Behind the phrase res judicata lies a rule of reason and practical necessity’ ” (Schwartz v Public Adm’r of County of Bronx, 24 NY2d 65, 70 [1969]); and have "emphasized that historically and necessarily collateral estoppel is a flexible doctrine which can never be rigidly or mechanically applied” (Gilberg v Barbieri, 53 NY2d 285, 292) and "[b]ecause the doctrine is based on general notions of fairness there are few immutable rules” (supra, at 291).
In order to successfully assert the defense of res judicata or collateral estoppel, the movant must meet the two requirements set forth by the Court of Appeals in the Gramatan case. "First, it must be shown that the party against whom collateral estoppel is sought to be involved had been afforded a full and fair opportunity to contest the decision said to be dispositive of the present controversy. Additionally, there must be proof that the issue in the prior action is identical, and thus decisive, of that in issue in the current action” (46 NY2d, at 485, supra).
The petitioner argues the doctrine of collateral estoppel does not apply because Judge Sweet’s decision concerning this issue of law was merely dictum and the court’s interlocutory decision was not a final decision.
In Moore v Aegon Reins. Co. (196 AD2d 250, 257) the appellate Court held a Federal Magistrate’s interlocutory decision does not necessarily preclude a finding that the order is final for collateral estoppel purposes. "In Gillespie v United States Steel Corp. (379 US 148,152), the Supreme Court stated: 'Under [28 USC] § 1291 an appeal may be taken from any "final” order of a district court. But as this Court often has pointed out, *809 a decision "final” within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case. Cohen v. Beneficial Industrial Loan Corp., 337 U. S. 541, 545. And our cases long have recognized that whether a ruling is "final” within the meaning of § 1291 is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and that it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the "twilight zone” of finality. Because of this difficulty this Court has held that the requirement of finality is to be given a "practical rather than a technical construction.” Cohen v. Beneficial Industrial Loan Corp., supra, 337 U. S., at 546. See also Brown Shoe Co. v. United States, 370 U. S. 294, 306; Bronson v. Railroad Co., 2 Black 524, 531; Forgay v. Conrad, 6 How. 201, 203.’ (But see, Coopers & Lybrand v Livesay, 437 US 463.)” (Supra, at 258.)
Judge Sweet spent approximately nine pages analyzing the factual and legal issues concerning the notice provisions imposed on section 8 tenancies. Judge Sweet specifically found there was an issue for his determination "whether Freddie Mac must meet the notice provision and cause standards imposed by section 8 or whether Freddie Mac may proceed in the absence of any constraints.” (Supra, at 1162.) Under these circumstances this court can hardly characterize Judge Sweet’s determination on this issue as merely dictum.
Accordingly, this court finds the petitioner is collaterally estopped from relitigating the issue of law concerning whether the respondents are still HUD section 8 tenants and whether petitioner is required to serve respondents in accordance with the notice requirements embodied in 24 CFR 882.215. Judge Sweet in his decision clearly and unambiguously stated there is indeed a landlord/tenant relationship between the parties herein, that respondents are HUD section 8 tenants and the notice requirements as stated in 24 CFR 882.215 apply.
Accordingly, this court finds the petitioner failed to properly notify and serve respondents in accordance with 24 CFR part 882 notice provisions and therefore the petition is dismissed without prejudice to re-serve in accordance with 24 CFR part 882.